**OPDYKE INVESTMENT COMPANY,
Plaintiff–Appellant,**

v.

**CITY OF DETROIT,
Defendant–Appellee.**

No. 86–1843.

United States Court of Appeals,
Sixth Circuit.

Argued May 6, 1988.

Decided Aug. 25, 1989.

William J. Lamping (argued), Erickson and Lamping, Bloomfield Hills, Mich., for plaintiff-appellant.

Gerald Warren, Detroit, Mich., Michael G. Vartanian (argued), Robert W. Powell, for defendant-appellee.

Before KRUPANSKY and NELSON, Circuit Judges, and TODD, District Judge.*

DAVID A. NELSON, Circuit Judge.

Prior to 1978 it was widely believed in keeping with the "state action" exemption from antitrust liability announced in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), that the federal antitrust laws were not intended to apply to municipalities. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), however, the Supreme Court held that the state action doctrine does not automatically exempt cities from the operation of the antitrust laws. The Court also held that a municipal body is a "person" within the contemplation of those laws. And in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Court held further that the state action doctrine does not protect a municipality in the exercise of "home rule" powers granted under a state constitution.

The decisions in *City of Lafayette* and *City of Boulder* led to enactment of the Local Government Antitrust Act of 1984, codified at 15 U.S.C. §§ 34–36. That statute—described by Congress as an act to "clarify" the application of the Clayton Act to the official conduct of local governments—established as a general rule that antitrust damages are not recoverable from any local government. This provision was made inapplicable to lawsuits commenced before September 24, 1984, however, "unless the defendant establishes and the court determines, in light of all the circumstances ... that it would be inequitable not to apply [the prohibition against recovery of damages] to a pending case."

The case at bar, a "pending case" under the statute, is an antitrust action that was filed against the City of Detroit on August 1, 1978—four months after the announcement of the Supreme Court's decision in *City of Lafayette*. The complaint alleged

that the city and the owners of the Detroit Red Wings, a professional hockey team, had begun violating the antitrust laws, to the plaintiff's injury, "on a date prior to August 3, 1977...." The dispute arose out of the city's efforts to keep the Red Wings in Detroit, rather than suffering a move of the team to a stadium that the plaintiff proposed to build on land it owned in Pontiac, Michigan. The relief sought included an award of treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15.

In 1986, before the case went to trial, the district court (Richard J. Suhrheinrich, J.) determined that in light of all the circumstances it would be inequitable not to let Detroit have the benefit of the statutory prohibition against damage awards. The action was therefore dismissed, any possibility of injunctive relief having been overtaken by events. The main question presented on appeal is whether the district court's balancing of the equities constituted reversible error. Having concluded that it did not, and having concluded further that the application of the 1984 Act did not violate the United States Constitution, we shall affirm the dismissal of the action.

I

The home games of the Detroit Red Wings used to be played in the Olympia Stadium, a facility located in Detroit and owned by Olympia Stadium Corporation. Like the Detroit Hockey Club, which held the National Hockey League franchise for the Red Wings, Olympia Stadium was a subsidiary of Norris Grain Company. (As did the district court, we shall refer to the three corporations as "Norris," or "the Norris group.")

In the spring of 1976 representatives of plaintiff Opdyke Investment Company, a Michigan partnership, met with Norris to discuss the possibility of developing a new sports arena for the Red Wings on Opdyke's Pontiac Township site. Norris also had discussions with Detroit about moving

---

* The Honorable James D. Todd, United States District Judge for the Western District of Tennessee, sitting by designation.

the Red Wings to a new riverfront arena to be built by the city in downtown Detroit.

In a letter sent to Detroit Mayor Coleman Young on February 14, 1977, Norris announced that it would not join the city in the proposed riverfront arena. Under date of March 11, 1977, Opdyke sent Norris a letter of intent purporting to memorialize an agreement in principle under which, subject to the obtaining of satisfactory financing, Norris would be the exclusive operator of an 18,000 seat stadium to be constructed in Pontiac. Norris would move the Red Wings to the new stadium, and would agree further "not to use, lease, or sell the present Olympia Stadium for a use which may be competitive with the new arena...."

Norris never signed the letter of intent. On April 1, 1977, however, Norris announced at a press conference that the Red Wings would be moved to an arena which, pursuant to an agreement with Opdyke, would be built in Pontiac with the proceeds of tax exempt revenue bonds.

Pontiac Township had authorized incorporation of an economic development corporation as a financing vehicle for the proposed stadium, and on April 4, 1977, the township adopted a recommendation of the corporation for the approval of the stadium project. Opdyke tried to get the Michigan National Bank of Detroit to underwrite the stadium bonds that were to be issued by the corporation, but on April 10, 1977, the bank declined to do so. Opdyke's complaint attributed the bank's decision to a conspiracy with the City of Detroit.

On April 29, 1987, the City of Detroit filed a declaratory judgment action in state court seeking a determination that Pontiac Township and its economic development corporation had violated Michigan law by pirating business from Detroit—a municipality which, unlike Pontiac, was economically depressed. A decision dismissing the lawsuit was appealed, and the pendency of the litigation forestalled any bond sale. Opdyke's complaint characterizes the city's suit as a "sham."

Moving forward with plans for construction of its own stadium, Detroit resumed negotiations with the Norris group. "It appears," the district court found, "that Norris told the City that it did not have a binding agreement with plaintiff and was free to contract." Norris' representation was backed up by an agreement to indemnify the city against any judgment predicated on a determination that Norris had broken a written agreement regarding the proposed Pontiac stadium.

On August 3, 1977, Norris signed a letter agreement with Detroit committing itself to move the Red Wings to a new 19,000 seat riverfront stadium to be built by the city for lease to Norris at what Opdyke calls a "bargain rate." The August 3 agreement provided that all of the Red Wing's home games would be played at the new riverfront facility. The agreement further provided that the existing Olympia Stadium would not be utilized in a manner competitive with the city's facility. Notwithstanding the parallel between these provisions and those contained in Opdyke's letter of intent dated March 11, 1977, Opdyke argues that the provisions "are prima facie evidence of a contract, combination and conspiracy to restrain and monopolize trade in the arena market."

## II

Opdyke brought a breach of contract action against Norris in state court during the latter part of 1977, ultimately recovering a substantial money judgment against Norris. The City of Detroit was never joined as a defendant in the state court proceeding, but on August 1, 1978, before that case had gone to trial, Opdyke brought the present federal antitrust action against both the city and the Norris group. The antitrust complaint contained allegations of an unlawful contract, combination and conspiracy to restrain trade in violation of § 1 of the Sherman Act (15 U.S.C. § 1) and monopolization and attempt to monopolize in violation of § 2 of the Sherman Act (15 U.S.C. § 2). Invoking the federal court's pendent jurisdiction, the complaint also asserted a state law claim for tortious interference with contractual and economic relationships between Opdyke and Norris.

Treble damages were sought under § 4 of the Clayton Act (15 U.S.C. § 15) in an amount totaling almost $212 million,[1] and the complaint contained a prayer for preliminary and permanent injunctive relief as well.

Opdyke chose not to press its request for injunctive relief acknowledging that the injunctive aspect of this case might become moot with the passage of time. At a hearing held before the district court on September 8, 1978, the court noted that the request for injunctive relief was presumably "making [Detroit's] bond attorneys nervous." Opdyke's counsel responded that "[w]e do ask for injunctive relief as an alternative prayer but at this point in time I have no intention and no purpose to move the Court for that relief." The judge warned counsel that "the further along the line the City of Detroit goes in getting involved with bonds and construction the almost impossible position you are going to get yourself into." Plaintiff's counsel responded, "I understand and I am willing to take that risk and there might be, there will come a time in the near future when the injunctive aspect of our case will become moot because it would be something the Court wouldn't seriously entertain."

At a hearing held on December 15, 1978, similarly, Opdyke's counsel told the court that "the principal thrust of our lawsuit is damages." Counsel expressly reaffirmed the statements made at the September 8 hearing ("that is exactly what I say today"), and noted that "[i]t may be that by the time we are able to convince the court that there is a violation of the law ... it will really be too late for you to order [injunctive] relief...." Opdyke's appellate brief confirms that money damages would be the only possible redress available now.

Aside from discovery proceedings, not much happened in the federal case until after Opdyke's contract action against Norris was concluded in state court. The state case was tried in the summer of 1984, and in March of 1985 the state court entered a judgment against Norris in an amount which, with interest and costs, exceeded $3 million. Norris then filed for protection under Chapter 11 of the Bankruptcy Code, and all proceedings against it were stayed for a time. Norris and Opdyke ultimately worked out a settlement, however, and by agreement Opdyke's federal court action against Norris was dismissed with prejudice on August 29, 1986.

Opdyke's antitrust claims against the city became the subject of extensive summary judgment proceedings based, in large part, on the Local Government Antitrust Act of 1984. In an order supported by a well-reasoned memorandum opinion, the district court granted a pre–1984 motion in which the city had sought partial summary judgment as to Opdyke's allegations of sham litigation and conspiracy with Michigan National Bank; granted the city's motion for a complete summary judgment under the 1984 legislation on all of the antitrust damage claims; and dismissed the pendent state law claims, without prejudice, pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This appeal followed.

### III

The Local Government Antitrust Act of 1984, "[a]n Act to clarify the application of the Clayton Act to the official conduct of local governments," 98 Stat. 2750, provides as follows in a section now codified as 15 U.S.C. § 35(a):

"No damages, interest on damages, costs, or attorney's fees may be recovered under section 15, 15a, or 15c of this title from any local government, or official or employee thereof acting in an official capacity."

Subsection 35(b) reads thus:

"Subsection (a) of this section shall not apply to cases commenced before the effective date of this Act unless the defendant establishes and the court determines, in light of all the circumstances, including the stage of litigation and the

---

**1.** The district court's opinion says that notwithstanding the figure used in the complaint, "plaintiff will be asking the jury to return a verdict of $24,000,000 against the City, which could be trebled to $72,000,000."

availability of alternative relief under the Clayton Act, that it would be inequitable not to apply this subsection to a pending case. In consideration of this section, existence of a jury verdict, district court judgment, or any stage of litigation subsequent thereto, shall be deemed to be prima facie evidence that subsection (a) of this section shall not apply."

The last sentence of 15 U.S.C. § 35(b) has no application here, of course; the matter not having progressed to a jury verdict or a district court judgment, the statutory bar against recovery of antitrust damages was not "prima facie" inapplicable. As the district court recognized, however, the City of Detroit nonetheless bore the burden of establishing, in light of all the circumstances, that it would be inequitable not to apply the bar. The district court determined that the city had carried this burden, and we find no error in the court's determination.

██ The district court acknowledged that "this matter is in a relatively advanced stage of litigation." In the absence of strong countervailing considerations, that circumstance might well have been deemed controlling. The availability of alternative relief is a circumstance no less significant than the stage of litigation, however—and even where a matter has actually gone to judgment, the final sentence of 15 U.S.C. § 35(b) shows that application of the statute is not absolutely precluded under any and all circumstances. The stage that the litigation has reached is a factor that must be given added weight after verdict or judgment,[2] but it is not necessarily entitled to preeminence before verdict or judgment. All of the other circumstances of that case must be considered, including the availability of alternative relief under the Clayton Act—or, for that matter, under the common law.

If Opdyke's antitrust claims had been meritorious, injunctive relief under the Clayton Act would have been a real possibility early on. "If plaintiff really wanted to halt performance under the Norris/City of Detroit agreement," the district court pointed out, "it could have sought injunctive relief from the summer of 1977 in state or federal court." In September of 1978, as detailed above, the district court warned that time was running out as far as injunctive relief was concerned; Opdyke's counsel nonetheless declined to move for such relief at that point. The district court observed as late as December of 1978, based on the representations of Opdyke's counsel, that "the possibility that at some time in the future the court may issue or be asked to issue a preliminary injunction is still a viable issue in the lawsuit and we should make our discovery decisions on that assumption." Opdyke nonetheless failed to bring on a motion to enjoin performance of the contract between Norris and the city.

In its brief on appeal, Opdyke tells us that injunctive relief is now unavailable: "Norris has sold the Red Wings and its lease interest in [Detroit's riverfront facility]. The only redress available to Opdyke is money damages."

It was not always so, under Opdyke's view of the case—and although injunctive relief had presumably become unavailable by the time the city moved for summary judgment under the 1984 legislation, we cannot say that the district court erred in treating Opdyke's failure to press for such relief earlier as a circumstance entitled to consideration. That circumstance obviously weighs in favor of the city.

More significant than Opdyke's allowing the clock to run on its claim for equitable

---

**2.** "If a case has progressed to or beyond a jury verdict or district court judgment, a local government defendant would need compelling equities on its side to justify the application of [15 U.S.C. § 35(a)] to the pending case." H.R. Conf.Rep. No. 1158, 98th Cong., 2d Sess. 3–4, reprinted in 1984 U.S.Code Cong. & Admin. News 4602, 4627. See also the comments of Senator Metzenbaum at 130 Cong.Rec. S 14368 (daily ed. Oct. 11, 1984):

"A number of Senators felt quite strongly that a plaintiff who has won a jury verdict should not have that verdict taken away by intervening legislation—others disagreed.

The Senate language, which was accepted by the conferees, reflects hardfought, difficult negotiations among Senators."

relief, perhaps, is the fact that whatever the merits of its case against the city, Opdyke did have what proved to be a viable damage claim against Norris. The city's motion for summary judgment was filed before Norris had instituted reorganization proceedings under the bankruptcy code, and if those proceedings delayed a recovery, they did not prevent Opdyke from ultimately reaching a post-judgment settlement with Norris.

It is true that the judgment recovered by Opdyke against Norris was not rendered in a proceeding brought under the Clayton Act, but the facts out of which the state court action arose were part and parcel of the facts underlying the antitrust suit. The district court concluded that "it would be consistent with the equitable purpose of the Act to consider the potential liability of other defendants." We fully agree. And if Opdyke's reading of the antitrust law is correct, Opdyke was entitled to a money judgment against Norris not only under state law, but under the treble damage provision of the Clayton Act as well.

Congress enjoined the courts to consider "all" of the circumstances in deciding whether or not to apply 15 U.S.C. § 35(a), and the circumstance that damages might be recovered from a private party was nowhere excluded from consideration.[3] Under the facts of the case at bar, the possibility of recovery from the city's co-defendant strikes us as a most important factor.

One of Opdyke's strongest arguments, after all, is that this lawsuit had reached a relatively advanced stage of litigation only because Opdyke had made a substantial investment of time and money in the case—

and it would be inequitable for the government to wipe that investment out by eliminating retroactively any prospect of meaningful relief. But the picture, in reality, is not that bleak. Norris, with which Opdyke said it had actually entered into a contract, was in no way insulated from liability by the 1984 Act. Opdyke's claim against the city could hardly have been any stronger than its claim against Norris. Opdyke has made no showing that its litigation costs, at least, could not be recovered from Norris, despite the latter's reorganization in bankruptcy, and from an equitable standpoint, notwithstanding that the liability of each defendant under the Clayton Act is joint and several, Opdyke's settlement with Norris takes much of the sting out of the dismissal of the claim against the city at a relatively advanced stage of the litigation. We note also that because Opdyke's pendent "tortious interference" claim against the city was dismissed, as was appropriate, "without prejudice," the court's application of the 1984 legislation did not foreclose a damage action against the city in state court.

"[T]he legislative history indicates that the Court should expressly consider at least three other factors in deciding the equity question." *Woolen v. Surtran Taxicabs, Inc.,* 615 F.Supp. 344, 351 (N.D. Tex.1985), *aff'd per curiam,* 801 F.2d 159, 166 (5th Cir.1986) (quoting the district court opinion in full), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1567, 94 L.Ed.2d 759 (1987).

"Among the other relevant factors, the court should properly consider:

First, whether the local government was acting within its normal legislative, regu-

---

**3.** It is true that in *Miami Int'l Realty Co. v. Town of Mt. Crested Butte,* 607 F.Supp. 448, 454 (D.Colo.1985), the district court stated that "[t]he legislative history clearly indicates that Congress contemplated that relevant alternative remedies would consist *solely* of Clayton Act injunctive relief against the municipal defendant, rather than damage relief from other private defendants." (Emphasis supplied.) This statement is not borne out by the legislative history cited in its support, and the proposition seems to us to be in conflict with the plain language of the statute. The phrase "all the circumstances" does not, on its face, mean anything less than the totality of the circumstances.

Even if the statute had mentioned availability of alternative relief "from the local government defendant"—a qualification that is conspicuous by its absence—this would not have made the listed factors exclusive. The Colorado district court was closer to the mark, we believe, when, at another point in its opinion, it characterized the statute as one "directing that all circumstances be considered and enumerating some, but not all, of the relevant factors." *Id.* at 452 n. 2. Opdyke itself concedes that "other equitable considerations are generally considered by the courts in ruling on the applicability of the Act to a pending case."

latory, executive, administrative, or judicial authority;

[S]econd, the financial harm which a treble damage award could inflict on the municipality and its taxpayers; and

[T]hird, whether the municipal action was predicated on or in furtherance of Federal or State laws, policies or regulations.

130 Cong.Rec. H12,187 (daily ed. Oct. 11, 1984) (remarks of Rep. Fish). *Accord, id.* at H12,184 (remarks of Rep. Lungren)." As quoted in *Woolen,* 801 F.2d at 166.

Noting that Michigan Comp.Laws § 123.958 specifically declares that the acquisition of public stadiums for lease to professional sport organizations constitutes a legitimate public purpose, the district court found in this case that the City of Detroit—a "home rule city" under Art. 7, § 22 of the Michigan Constitution—was acting within its normal authority in constructing a downtown sports arena and leasing it to the Red Wings:

"It cannot be seriously disputed that a city's economic welfare is one of the major concerns of a municipal government. If the construction and lease of a stadium for use by a professional sports organization enhances the local economy, the city has thus engaged in a legitimate public purpose. *See generally City of Gaylord v. Gaylord City Clerk,* 378 Mich. 273, 296–301 [144 N.W.2d 460, 468–71] (1966). At this juncture, it appears to the court that the agreement [of August 3, 1977] does facilitate that objective."

Nothing in the 1984 statute or its legislative history suggests that Congress was concerned solely with such traditional governmental functions as providing fire and police protection or zoning regulation. On the contrary, the Chairman of the Senate Judiciary Committee expressed concern that the Supreme Court's limitation of local governments' antitrust immunity had affected a panoply of local activities "ranging from procurement, to zoning, to the operation of airports and sports arenas." *Local Government Antitrust Immunity: The Boulder Decision: Hearings Before the Senate Committee on the Judiciary,* 97th Cong., 2d Sess. 1 (1982) (statement of Sen. Thurmond). Municipal operation of sports arenas may be a more recent phenomenon than municipal provision of fire and police protection, but it is a phenomenon of which Congress obviously was not unaware.

As to the financial harm that a treble damage award could inflict on the municipality and its taxpayers, the district court thought it self-evident that a judgment of $72 million would have an adverse impact on the city. As the court went on to observe,

"According to the City Budget Director, the City currently operates within a budget of $1.6 billion. Should the $72 million be awarded against the City, it would not be able to satisfy the judgment within the current fiscal year. The Court notes that Detroit is experiencing a rapid decline in population and a diminishing tax base. With the inception of Gramm–Rudman, the City will be receiving a substantially smaller amount of financial support from the federal government. Faced with a multi-million dollar judgment, the City might not be in a position to make the appropriate budget adjustments without harming the public fisc, or cutting back on necessary services which are already inadequate. This is the type of financial harm the Act was intended to prevent."

Opdyke responds that the city currently has a budget surplus and spends large sums of money on projects of allegedly dubious merit. Be that as it may, Opdyke has failed to refute the district court's specific factual findings. We are in no position to declare those findings erroneous.

Opdyke argued in the district court, as it does here, that equitable relief under the statute is barred because the city had "unclean hands" as a matter of law. Opdyke and the city were competitors in the leasing of sports arenas, runs the argument, and the agreement entered into between the city and the Norris group on August 3, 1977, was an agreement that the Norris companies would "establish and maintain a group boycott and concerted refusal to deal

with a competing leasor, Opdyke." Such an agreement on a group boycott, Opdyke says, was illegal per se.

This line of argument left the district court unmoved:

"The court is ... not convinced that this agreement constitutes an antitrust violation. The City merely out-negotiated plaintiff and offered the Norris Group a better deal. While the Norris Group may have viewed the agreement as merely a business deal, the City's objective was to keep the professional sports team in the City. The end-result of plaintiff's proposed agreement would have been to monopolize sports arenas, if they are indeed a product which can be monopolized, in Pontiac. Would plaintiff and the Township of Pontiac then be liable for an antitrust violation?"

It is true that the parent and subsidiary companies constituting the Norris Group were separately incorporated, but they must be treated as a single entity under the antitrust laws. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). This is not a group boycott case at all, as we see it. Agreements such as those between Norris and the City of Detroit are vertical agreements that must be evaluated under the rule of reason; they are not illegal per se under the Sherman Act. *Business Electronics Corp. v. Sharp Electronic Corp.*, 485 U.S. 717, ——, 108 S.Ct. 1515, 1519–21, 99 L.Ed.2d 808 (1988); *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241 (6th Cir.1982). Under the rule of reason, the district court had ample grounds for doubting that the city's agreement with Norris was in conflict with federal antitrust law.

If it be thought that the agreement not to dispose of the old Olympia Stadium in a way that would pose a competitive threat to the City's new riverfront facility smacks of a horizontal arrangement between owners of sports arenas, the fact remains that even if Opdyke's own hands were assumed to be clean in this respect, Opdyke has not shown how this particular provision could be the proximate cause of any injury to it.

See *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982) (analysis of a plaintiff's standing to sue for treble damages under § 4 of the Clayton Act resembles traditional proximate cause analysis).

If the district court had believed that Opdyke suffered some injury as the result of an antitrust violation by the city, the court still would not have been required to accept Opdyke's "unclean hands" argument. The statute does not say that a municipality claiming the protection of 15 U.S.C. § 35(a) must have no actual liability under the antitrust laws—and it would be strange indeed for Congress to limit the protection accorded by the 1984 legislation to municipalities least in need of protection.

There is another circumstance, not mentioned by the district court, that supports the court's conclusion. Opdyke's claim is based on a series of events that culminated in the execution of a contract between Norris and the City on August 3, 1977—almost eight months before the Supreme Court's controversial decision in *City of Lafayette*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), and some four years and five months before the decision in *City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). "[T]he legislative history of the Sherman Act reveals no evidence of an express Congressional intent to apply the antitrust laws to either state or local governments," H.Rep. No. 965, 98th Cong., 2d Sess. 4, 1984 U.S. Code Cong. & Admin. News at 4605, and at the time the city signed the contract with Norris it was by no means unreasonable for a municipality to assume that actions taken in the exercise of its constitutionally conferred home rule powers would be exempt from scrutiny under the federal antitrust laws. If the City of Detroit had entered into its contract with Norris *after* the Supreme Court's decisions in *City of Lafayette* and *City of Boulder*, perhaps it would have been less inequitable to treat the city like a private person; but the fact that the die had been cast with Norris well before the Supreme Court's *Lafayette* and *Boulder* decisions obviously strengthens Detroit's equitable

claim for protection under the 1984 legislation.

## IV

In addition to holding that it would be inequitable not to accord the city the protection of 15 U.S.C. § 35(a), the district court held that (a) the city's prosecution of its state court lawsuit against the Pontiac Economic Development Corporation was not actionable under the antitrust laws, and (b) the city was entitled to summary judgment on the claim that it conspired illegally with the Michigan National Bank of Detroit to block financing for the proposed Pontiac stadium. We shall address both of these rulings briefly before turning to the constitutionality of the 1984 legislation.

### A

■ Under the *Noerr–Pennington* doctrine, which takes its name from *Eastern Presidents Railroad Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), "genuine attempts to influence passage or enforcement of laws are immune from antitrust scrutiny, regardless of the anticompetitive purpose behind such attempts." *Westmac, Inc. v. Smith*, 797 F.2d 313, 315 (6th Cir. 1986), *cert. denied*, 479 U.S. 1035, 107 S.Ct. 885, 93 L.Ed.2d 838 (1987). The doctrine is based on a right of petition that extends also to exercise of the right to petition courts for judicial relief. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972).

■ Although antitrust liability may not normally be predicated upon the prosecution of litigation, the *California Transport* decision recognized an exception to the general rule; where the antitrust defendants were alleged to have engaged in concerted action to achieve illegal objectives through resort to a rash of "sham" lawsuits and administrative proceedings, *Noerr–Pennington* did not apply. The sham lawsuit exception to the *Noerr–Pennington* doctrine is a "narrow one," *West-*

*mac v. Smith*, 797 F.2d at 318, and in the case at bar the district court found no reason to suppose that the city's solitary suit against the Pontiac Economic Development Corporation came within the exception. We agree with this conclusion.

■ In *City of Cleveland v. Cleveland Electric Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), we indicated that it would avail an antitrust plaintiff nothing to show that the defendant had surreptitiously caused a front man to institute a lawsuit against the plaintiff, even if the suit proved to be without merit, absent a showing of clear abuse of process. Opdyke made no showing of abuse of process here. Although the state trial court rejected the legal theory on which the Pontiac case was predicated, the court did not treat the theory as frivolous. We do not understand Opdyke to contend that the theory of the city's case was so farfetched as to warrant the imposition of sanctions against the attorneys who brought it, and Opdyke has offered no significant analysis of the city's case at all. The city's appeal (which did not constitute a second action, of course) was never decided on the merits, the case having become moot before the state appellate court reached it. There is no suggestion here of perjury, or bribery, or any other such reprehensible practice. On this record, notwithstanding that the prosecution of the lawsuit was presumably part of a broader pattern of conduct intended to block construction of the arena in Pontiac and keep the Red Wings in Detroit, we cannot quarrel with the district court's disposition of the sham litigation issue.

### B

The pendency of Detroit's lawsuit against the Pontiac Economic Development Corporation may have had a more significant impact on the financing of the Pontiac stadium than did the decision of the Michigan National Bank of Detroit not to underwrite the bond issue—for Opdyke apparently was able to arrange for another bank

to underwrite the bonds after Michigan National decided not to do so. Be that as it may, the district court found—and we agree—that there was no showing of a genuine issue of material fact as to whether the refusal of Michigan National to participate in the financing was the result of an illegal contract, combination, or conspiracy between the city and the bank.

Relying in part on newspaper articles which the district court properly refused to consider, Opdyke contended that a man named Alfred Pellam, who was both a member of the bank's board of directors and a member of the executive committee of the city's economic growth council, persuaded the bank to pass up participation in the proposed bond issue by threatening resignation from the board and withdrawal of the city's multi-million dollar bank deposits. Mr. Pellam was a former city official and a friend of Mayor Coleman Young, but that did not make him an agent of the city. Opdyke has not called our attention to any competent evidence showing that the city had authorized Mr. Pellam to act on its behalf, and in the absence of such evidence we have no basis for accepting Opdyke's argument that "Pellam *was* the City." Mr. Pellam may have opposed the Pontiac stadium in the belief that its construction would be bad for Detroit, but that is beside the point as long as Mr. Pellam was not shown to be doing Detroit's bidding. The district court's explanation of its decision to grant partial summary judgment on the bank conspiracy issue appears no less sound than its reasoning on the sham litigation question, and in our view the city would have been entitled to prevail on both issues even if the 1984 legislation had never been enacted.

## V

Opdyke makes no claim that the application of the 1984 statute was unconstitutional under the Takings Clause of the Fifth Amendment ("nor shall private property be taken for public use, without just compensation"). Opdyke does maintain, however, that the cause of action which allegedly accrued to it under § 4 of the Clayton Act—a cause on which Opdyke spent considerable time, money and effort—constituted "property" of which it could not constitutionally be deprived, under the clause immediately preceding the Takings Clause, "without due process of law." There was a deprivation of property in this case without due process of law, Opdyke asserts, along with a denial of equal protection of the laws, a violation of the "freedom from arbitrary or capricious governmental activity protections afforded Opdyke by the Fifth Amendment," and a violation of the Constitution's separation of powers principle. Some of these questions are rather intriguing, but in the end we find Opdyke's constitutional arguments unavailing.

We take it as given that a private cause of action, once it has accrued, is, for constitutional purposes, a species of "property." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982), citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Quoting *Bradley v. School Board,* 416 U.S. 696, 720, 94 S.Ct. 2006, 2020, 40 L.Ed.2d 476 (1974), to the effect that "[t]he Court has refused to apply an intervening change [in statutory law] to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional," the city argues that a private cause of action cannot become a vested property interest until it has been reduced to judgment in a liquidated amount. *Bradley v. School Board* does not support this argument, in our view, and we have been referred to no Supreme Court decision that does.[4]

---

**4.** See, however, *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638 n. 32, 57 L.Ed.2d 595 (1978): "The 'Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object,' *Silver v. Silver,* 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221 (1929), despite the fact that 'otherwise settled expectations' may be upset thereby. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)."

█ The conclusion that the antitrust claims stated in Opdyke's complaint represented a form of property is immaterial, of course, if the "property" had no value. If, as the district court appears to have believed, Opdyke's antitrust claims were without merit as a matter of law—if no relief could have been granted on the claims even if they had gone to trial—Opdyke obviously suffered no constitutional deprivation when the court dismissed the claims on motion for summary judgment, thereby sparing the plaintiff the cost of a trial it would inevitably have lost. There is no protected property interest in claims that are legally insufficient.

█ Even if a portion of Opdyke's antitrust claims could have been deemed meritorious, moreover, the hypothesis that there was a vested property interest of some potential value would not necessarily mean that such interest had not, from the beginning, been subject to retroactive amendment by the body that created it. To borrow a phrase from our opinion in *Fisch v. General Motors Corp.*, 169 F.2d 266, 270 (6th Cir.1948), *cert. denied*, 335 U.S. 902, 69 S.Ct. 405, 93 L.Ed. 436 (1949), a case dealing with causes of action founded on the Fair Labor Standards Act, enactment of the Sherman and Clayton Acts "did not establish fixed rights of either present or future enjoyment." In making certain economic behavior actionable as a matter of federal law, in other words, Congress implicitly reserved the right to withdraw that which it had seen fit to bestow:

> "Plaintiffs could not expect that their status or rights would remain unchanged through changing circumstances and conditions. They could reasonably anticipate changes in the law. The proposition that their rights granted by the Congress under the commerce clause could not be taken away by congressional legislation under the same clause, is self-contradictory. Rights secured even by private contract may be abrogated by subsequent legislation when authorized by constitutional provisions."

*Id.* at 271.

Whatever merit this line of reasoning may have in other contexts, it is not unpersuasive here. Antitrust is a notably uncertain and changeable branch of the law—a branch that conforms more closely to Heraclitus' view of the world than to Empedocles'—and we venture to suppose that in 1977, when the City of Detroit was engaging in the conduct of which Opdyke now complains, neither Opdyke's lawyers nor the city's would have been likely to counsel that the city could be sued successfully for damages under the federal antitrust laws. It was not until 1978—after Norris had signed on with the city, and after Opdyke had brought its lawsuit against Norris alone—that the Supreme Court handed down its five-to-four decision in *City of Lafayette*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364. Opdyke may or may not have been suprised at that decision's invitation to sue (an invitation that it took Opdyke four months to accept), but we see no reason for any particular surprise that Congress should ultimately have chosen to "clarify" the law by withdrawing the invitation in those pending cases where it could be found "inequitable" not to reinstate the immunity which municipalities had previously been thought to enjoy. If the withdrawal of the invitation be thought ungracious—or, as Opdyke would have it, "repugnant to every notion of fair play, substantial justice, and due process of law"—we can only observe that the action taken by Congress here seems at least as easy to defend on equitable grounds as many other retroactive enactments in the economic sphere. See, for example, *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), where a unanimous Supreme Court upheld the retroactive application of the Multiemployer Pension Plan Amendments Act of 1980 as "supported by a legitimate legislative purpose furthered by rational means." *Id.* at 729, 104 S.Ct. at 2717–18.

Opdyke urges us to hold that the statutory standard for determining when damage claims will be foreclosed in pending suits is too "vague" to pass muster under the Due Process Clause. The standards set forth in the 1984 legislation are certainly no more uncertain than such standards

as may be discernible in the text of the Sherman and Clayton Acts themselves, however, and we see no merit in this part of Opdyke's argument.

We are equally unimpressed by the contentions that (a) the district court ought to have impaneled a jury before ruling on the summary judgment motion, and (b) "[t]he Act [is deficient because it] makes no provision for a hearing or fact finding determination regarding the alleged grounds offered by the City in support of its [summary judgment] motion." Opdyke had ample opportunity to respond to the city's summary judgment motion by affidavit or otherwise (see Rule 56(e), Fed.R.Civ.P.), and the district court clearly conducted the type of hearing contemplated by Rule 56(c). Opdyke having failed to demonstrate the existence of a genuine issue as to any material fact that would have precluded entry of judgment for the city as a matter of law, there was no need for a jury.

Opdyke's equal protection argument is based on the notion that it was irrational for Congress to distinguish between governmental defendants and private defendants, between damage claims based on antitrust violations and other damage claims, and between claims that could inflict financial harm on local governments and claims that could not. A rational basis for each of these distinctions seems obvious to us, and if this were a Fourteenth Amendment case we should be at a loss to find any arguable violation of the Equal Protection Clause.

Opdyke's separation of powers argument was not presented to the district court, and thus need not be considered here.

### VI

The course of this appeal was marked by repeated failures of Opdyke's counsel to adhere to the time limits for filing appearance forms and briefs, and at one point this court went so far as to dismiss the appeal, after issuance of a show cause order, for failure to file an overdue joint appendix. The appendix was tendered for filing some four months after the dismissal, and a month after that Opdyke moved for rein-

statement of its appeal. The motion for reinstatement was granted. Soon thereafter we received a brief from the city opposing reinstatement, and we elected to treat the brief as a motion for reconsideration on which we would reserve our ruling until after oral argument. Having disposed of the appeal on the merits, we now DENY the motion for reconsideration.

In opposing the motion, Opdyke suggested that double costs might be awarded to the city if it prevailed on the merits. We do not believe that an award of double costs is necessary, and the clerk will enter an order AFFIRMING the judgment of the district court with an award to appellee of its actual taxable costs.