**Robert EATON, Plaintiff–Appellee,**

v.

**NEWPORT BOARD OF EDUCATION, et al., Defendants,**

**Kentucky Education Association; and William Gist, Defendants–Appellants.**

**No. 90–6330.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 21, 1991.

Decided Sept. 17, 1992.

Rehearing and Rehearing En Banc Denied Nov. 9, 1992.

Jeremiah A. Collins (argued), Martin Lederman (briefed), Bredhoff & Kaiser, Washington, D.C., John Frith Stewart, Dennis Franklin Janes, Segal, Isenburg, Sales, Stewart & Cutler, Louisville, Ky., for defendants-appellants.

Before: RYAN and BOGGS, Circuit Judges; and GODBOLD, Senior Circuit Judge.*

BOGGS, Circuit Judge.

This is an appeal of a jury verdict of $1 million rendered in favor of Robert Eaton based on his claims, brought pursuant to 42 U.S.C. § 1983 that the defendants conspired to violate his procedural and substantive due process rights and that the defendants committed the tort of outrageous conduct against him. Upon review, we hold that this verdict violates the first amendment rights of the Kentucky Education Association ("KEA") and William Gist. We therefore reverse the judgment of the district court.

I

Robert Eaton was the principal of the Owens Elementary School in Newport, Kentucky for over eighteen years. On June 4, 1987, Eaton was in his office introducing a new teacher to various other school personnel. There was testimony that a student was also present. Sylvia Covington, an assistant clerk in the Owens Elementary media center, walked into Eaton's office as the introduction was taking place. She was the only Black employee at the school. At some point, Principal Eaton asked the new teacher: "... have you met Sylvia Covington, our resident nigger?" Covington became embarrassed and upset and left the office immediately. She then consulted two supervisors in the school about the incident.

Covington next phoned Newport School Superintendent Bernard Sandfoss to complain about the incident. On June 8, 1987, Covington sent Sandfoss a formal letter of

Robert C. Cetrulo (argued & briefed), Robert C. Cetrulo, Covington, Ky., Robert B. Cetrulo, Ware, Bryson, West & Bartlett, Edgewood, Ky., Stephen T. McMurtry, McMurtry & Wolff, Covington, Ky., for plaintiff-appellee.

* The Honorable John C. Godbold, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

complaint. Sandfoss then began investigating the matter. On June 9, 1987, Eaton sent a letter to Covington stating that the remark was intended as "good-natured ... jest." Eaton reminded Covington in the letter that they had engaged in similar "joking" during their eighteen years of working together.

Sandfoss scheduled a meeting for July 1, 1987 to discuss the incident. Eaton and his attorney, an attorney for the Newport School Board, and Covington attended the meeting. Covington was accompanied by William Gist and Clifton Bird, who claimed to represent the Kentucky Education Association and Covington. Gist was the local managing agent for the KEA. A transcript of this meeting was entered into the record at trial.

At the meeting, Covington maintained that Eaton's letter was not sufficient to resolve the matter. She insisted on a public apology by Eaton in front of the School Board and the staff of Owens Elementary. Eaton was unwilling to do this. Eaton now argues that Gist was out for blood and was instigating Covington. He claims that Covington would have been happy with a promise that this would never happen again, but that Gist convinced Covington to pursue this grievance and used her as a pawn in the conspiracy to have Eaton dismissed. At the meeting, Gist kept insisting that a Board policy had been violated and that Eaton's termination had to be considered.

Under Kentucky law, a teacher may be terminated for "conduct unbecoming a teacher." Ky.Rev.Stat. § 161.790. A Newport School Board policy promulgated pursuant to Ky.Rev.Stat. § 161.790 prohibits a teacher from publicly belittling or criticizing others. According to the policy, such conduct amounts to insubordination. Appellants KEA and Gist agree that Gist did indeed argue that the Board policy had been violated and that the violation should be dealt with seriously, but they maintain that Covington agreed with this position.

Eaton also argues that viewed in the context of his eighteen-year relationship with Covington, his "resident nigger" remark is not as bad as it seems. Eaton claims that he had a friendly relationship with Covington and they frequently made racial remarks to each other in jest. He claims that on the day he made the remark at issue here, Covington entered his office calling him a "fool" and a "turkey." Eaton claims he responded without thinking. He contends that while he may have shown a lack of judgment in making the remark as an introduction, it was only intended as good-natured banter. Eaton further claims that he is a man of impeccable character and is liked by almost everyone who knows him.

Appellants KEA and Gist do not dispute that Covington and Eaton had a long history of making these kinds of remarks to each other. In the past, Eaton had called Covington "chocolate," "darkie," "blacky," and had joked about putting Covington "on the auction block." For her part, Covington had many times referred to Eaton as "whitey" or "honky." At one school dance, Covington had asked Eaton to dance and told him: "You can't outdance this nigger." Finally, Covington had called Eaton a "dumb honkey" in public at a PTA dinner just two weeks before the incident at issue in this case. However, KEA and Gist maintain that while all of this is true, Eaton never before called Covington a "nigger" and had certainly not done so when introducing her to a stranger. They claim that Covington had been genuinely hurt and insulted by Eaton's· "resident nigger" remark.

After the meeting on July 1, Sandfoss scheduled a July 9 meeting of the full School Board to discuss this incident. There is no evidence that Sandfoss discussed this incident again with KEA and Gist. Sometime after the July 1 meeting, Sandfoss concluded that Eaton's conduct might well have been "belittling" in violation of Board policy and that it was inappropriate conduct for a school supervisor. Before the School Board meeting on July 9, Sandfoss met with the new attorney for the Board, Robert Blau, to discuss the options available to the Board in this situation.

Blau told Sandfoss that Eaton's remark was "belittling" and therefore violated the

Board's policy and constituted insubordination under Ky.Rev.Stat. § 161.790. Blau also advised Sandfoss that it was necessary to file charges against Eaton and that the only sanction available under Ky.Rev.Stat. § 161.790 was termination. Sandfoss also received an unsolicited letter from Betty Fields, who had witnessed this incident. She informed Sandfoss that she thought the remark had been "uncalled for and in very bad taste." Sandfoss testified at trial that KEA's involvement in this matter did not affect his decision to submit this case to the full board for consideration.

The July 9 School Board meeting was open to the public and was, by all accounts, well-publicized and highly contentious. A large crowd who favored Eaton's dismissal gathered, carrying signs and protesting vocally. Gist played a major role in the picketing at the meeting. In fact, *The Kentucky Enquirer,* a local newspaper, ran a picture of Gist, gesturing dramatically under a teacher's union sign, with the following caption: "Principal's firing urged.... Bill Gist, area director for the Kentucky Education Association, talks to supporters outside the Administration Building in Newport Thursday." Appellants Gist and KEA claim that Gist did not organize the gathering in support of Covington, but did speak at it. Eaton claims that KEA's visible and vocal presence at the proceedings pressured the Board to take the action that it did against him.

At the meeting, Sandfoss recommended that the Board issue charges against Eaton for conduct unbecoming a teacher and for insubordination. The Board unanimously accepted this recommendation. The Board also suspended Eaton without pay until this matter could be considered. KEA and Gist claim that their vocal support of Covington did not determine the Board's action.

Under Kentucky law, Eaton was entitled to have either a public or private hearing of his case before the School Board. Eaton chose to have a public hearing. The School Board held a two-day adversarial hearing on August 21 and 22, 1987, pursuant to the rules prescribed by Ky.Rev.Stat. § 161.790.

Eaton was represented by counsel and was permitted to call and cross-examine witnesses. The Board took the precaution of hiring another attorney, Beverly Storm, to act as the hearing officer. She administered the hearing and made legal and evidentiary rulings.

A large crowd attended the hearing, with supporters of both sides present. Some of these individuals displayed placards stating their opinions. There was no evidence that either KEA or Gist organized or directed the crowd in any way. Neither Gist nor any other KEA representative testified or otherwise took part in the hearing. Once the hearing concluded, Gist told a reporter that if the Board did not fire Eaton, KEA would assist Covington in filing a lawsuit against the Board.

This alleged threat was broadcast by local media and the only dispute between the parties regarding this issue concerns whether any of the Board members were actually influenced by this report. KEA and Gist admit that there were some KEA placards displayed at the meeting, but claim that they had nothing to do with the signs. Eaton argues that the signs were extremely disruptive of the hearing, but KEA and Gist deny this.

Eaton also puts great emphasis on the fact that the KEA supported the election of three of the five School Board members and that it "cashed in" on that support by seeking his firing at the hearing.

After the hearing, various Board attorneys advised the Board members that if they found Eaton guilty, they had no alternative under the statute but to dismiss Eaton. The Board eventually voted 3 to 2 in favor of Eaton's termination. The Board members indicated that no external factors, including the KEA, influenced their votes.

Eaton appealed his dismissal to a state trial court, which affirmed the Board's actions. Eaton then appealed the trial court's decision to the Kentucky Court of Appeals. That court eventually reversed the state trial court and ordered the School Board to reinstate Eaton with full back pay. Meanwhile, Eaton filed this lawsuit

against Covington, the Newport School Board, Sandfoss, the KEA and Gist in the federal district court, seeking compensation for their alleged conspiracy to violate his constitutional rights.

Just before trial, Eaton reached a settlement with the School Board and Sandfoss. The district court also eventually directed a verdict in favor of Covington. Those defendants are not part of this appeal. Eaton's case against KEA and Gist went to the jury on the following claims: federal civil rights conspiracy claims under 42 U.S.C. §§ 1983 and 1985, a state law discrimination claim, and the state tort of outrageous conduct. In its special verdict, the jury rejected the § 1985 claim and the state law discrimination claim. However, after being instructed by the trial court that Eaton's conduct did not constitute "belittlement" or "conduct unbecoming a teacher" and that the Board had acted arbitrarily in terminating him, the jury found that KEA and Gist had conspired with Sandfoss to have the Board deprive Eaton of his constitutional rights of procedural due process, substantive due process, and equal protection in violation of § 1983. The jury also found KEA and Gist guilty of outrageous conduct.

The jury awarded compensatory damages of $50,000 against KEA and Gist, but this award was set off against the settlement reached with the School Board and is not at issue in this appeal. The jury also awarded $1,000,000 in punitive damages against KEA and Gist. The district court then granted the defendants' motion for Judgment Notwithstanding the Verdict ("JNOV") on the equal protection claim raised under § 1983. The court denied the JNOV motion with regard to the substantive and procedural due process claims and for the tort of outrageous conduct. The district court ultimately entered judgment against KEA and Gist for $1,000,000 plus interest.

Eaton's case centers on an alleged conspiracy between KEA, Gist, and the Board of Education to fire him. Eaton claims that he has had previous conflicts with the KEA and that the organization used its political influence to destroy his reputation and to ensure that he was terminated by the Board. Eaton maintains that Covington was a pawn in this conspiracy to injure him. Eaton argues that the jury verdict in his favor is supported by sufficient evidence and is not clearly erroneous.

KEA and Gist argue that the Newport School Board did not deny Eaton due process, either procedural or substantive, and even if it did, such a denial did not result from any action taken by KEA and Gist. Appellants further argue that they did not commit the tort of outrageous conduct. In addition, KEA and Gist argue that the first amendment protects all of their activities upon which the jury verdict was based. The appellants also contend that the district court improperly instructed the jury and made several improper evidentiary rulings. Finally, KEA and Gist argue that, putting everything else aside, the punitive damages award is excessive.

For the reasons given below, we hold that all of the actions taken by Gist and KEA in this case are protected by the first amendment. The jury verdict rendered against them, therefore, cannot stand.

II

KEA and Gist were the only remaining defendants by the time the district court submitted this case to the jury. The jury returned, and the district court sustained, a verdict of $1,000,000 against KEA and Gist. The basis for this verdict was the jury's finding that the actions of KEA, Gist, and the Newport Board of Education amounted to a conspiracy to violate Eaton's constitutional rights to substantive and procedural due process, in violation of § 1983. The verdict was also based on the jury's determination that the actions of KEA and Gist amounted to the tort of "outrageous conduct." A review of the record makes it immediately apparent that even on the jury's view of the facts, KEA and Gist cannot be held liable because their actions are protected by the first amendment.

Eaton objects to the actions taken by KEA and Gist to secure his termination,

contending that Gist and KEA conspired with the Board to terminate Eaton. Eaton argues that this "conspiracy" consisted of Gist and KEA calling on the Board to terminate him and encouraging others to do the same.

Eaton also maintains that Gist and the KEA publicly labeled him a "racist" because of the remarks he made. He claims that he has had a bad relationship with the KEA in the past, and the organization used this opportunity to get back at him. Eaton further claims that the KEA had influence over the Board because it had contributed to the election campaigns of three of the Board members.

Eaton, however, presents no evidence for these claims beyond the KEA's and Gist's advocacy on behalf of Covington. There is no evidence whatever of any bribery, or any other use of tactics on the part of the defendants that would be inherently illegal. In fact, all of the actions that Eaton presents as a basis for the charges in this case were public, and all quite legal.

KEA and Gist publicly argued that Eaton should be terminated for his actions toward Covington. The defendants' personal motivation for doing so and the extent of their public lobbying on behalf of their position are both disputed facts. The ultimate effectiveness of the actions of KEA and Gist are also open to question. But for purposes of this case, all of these facts are irrelevant. What is relevant, and dispositive, is that all of the actions taken by the defendants, even if everything Eaton says is true, are simply not actionable because they are all protected by the first amendment. In short, what Eaton attempts to characterize as a conspiracy is more accurately and commonly known as free expression and political organizing.

### III

The first amendment to the United States Constitution prevents the government from "abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." In an analogous case, this Circuit held that, under the first amendment, a citizen who lobbied a school board to terminate a teacher was protected from liability.

In *Stachura v. Truszkowski*, 763 F.2d 211, 213 (6th Cir.1985), *rev'd on other grounds, Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) the Memphis, Michigan School Board dismissed Edward Stachura, a Life Science teacher, for improper teaching methods in a sex education class. Stachura sued the School Board, the School District, the school superintendent, the principal of his school, and a private citizen, Delores Truszkowski, who had lobbied the Board vehemently for Stachura's dismissal. The *Stachura* court found that although Truszkowski was ultimately responsible for Stachura's dismissal, Truszkowski could not be held liable for her actions because they were protected by the first amendment.

The *Stachura* court's discussion of the issue is important to the instant case:

Appellee Truszkowski was responsible for starting the sequence of events which transpired in these two cases. She organized and transmitted complaints to the School Board concerning Stachura's teaching of a Life Science class alleging improper teaching methods. Various other parents in the community joined her subsequently in vehement and continuing protests, based on unfounded rumors, leading directly to Stachura's removal. Although Truszkowski's role was pivotal in initiating these protests, it was made to the public body having charge of the educational system in the community concerned. As such, it was protected, as the District Judge held, by the right to petition encompassed in the First Amendment to the Constitution of the United States....

While Ms. Truszkowski's role in these events is not a pretty one, we agree with the District Judge that it was a petition addressed to the proper authority and as a consequence, her actions were immunized from this suit by her First Amendment rights.

*Id.* at 213.

The actions of Truszkowski could easily be considered more egregious than those of

**298**

KEA and Gist in this case. Truszkowski's actions were said to be based on unfounded rumors and were found to be the cause of Stachura's removal. In this case, the defendants' actions centered on a statement that Eaton admits that he made. KEA and Gist were merely exercising their first amendment right to petition the proper governmental body for the removal of Eaton, and their first amendment right of free speech.

Eaton makes much of the fact that he was labelled a "racist" because of the efforts of KEA and Gist. However, even in today's world, when epithets such as "racist" and "fascist" are used casually with appalling regularity, Eaton's remark might fairly be perceived as coming from a "racist." *See Stevens v. Tillman,* 855 F.2d 394, 402 (7th Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989).

KEA and Gist reacted in an understandable way to a racial epithet made in a professional context by an elementary school principal. In their opinion, Eaton had violated Board policy and Kentucky law by making the remark, and they believed that he should be disciplined according to those provisions. In an effort to ensure that Eaton was disciplined, KEA and Gist legally and reasonably petitioned the body responsible for making such decisions. As such, their activity was protected by the first amendment.

■ We note, however, that the rights of Gist and the KEA are not circumscribed by a judgment that their complaints against Eaton were reasonable or fair. A citizen's right to petition is not limited to goals that are deemed worthy, and the citizen's right to speak freely is not limited to fair comments. This case presents us with the delicate and sensitive task of accommodating the first amendment's protection of free expression of ideas with the common law's protection of an individual's interest in reputation. It is a truism that the free flow of ideas and opinions is integral to our democratic system of government. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).

■ Like the *Stachura* court, we also find support by analogy to the *Noerr–Pennington* doctrine. *Stachura,* 763 F.2d at 213. That doctrine holds that business interests may combine and lobby to influence the legislative, executive, or judicial branches of government or administrative agencies without violating the antitrust laws, because such activities are protected by the first amendment right of petition. *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Under the *Noerr–Pennington* doctrine, liability may not be assessed under § 1983 or the antitrust laws except in very limited circumstances, for actions taken when petitioning authorities to take official action, regardless of the motives of the petitioners, even where the petitioning activity has the intent or effect of depriving another of property interests. *Video Int'l Prod., Inc. v. Warner–Amex Cable Communications, Inc.,* 858 F.2d 1075, 1084 (5th Cir.1988), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989).

The Supreme Court has carved out a narrow "sham" exception to this doctrine, which covers cases where the defendant intended to use the petitioning process merely to harass the plaintiff. *City of Columbia v. Omni Outdoor Advertising, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991); *Opdyke Inv. Co. v. City of Detroit,* 883 F.2d 1265, 1273 (6th Cir.1989). The actions of KEA and Gist in this case do not fall within this limited exception. The petitioning and speaking clearly intended to accomplish the ostensible object, the removal of Eaton.

Finally, we note the case of *Stevens v. Tillman,* 855 F.2d 394 (7th Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989). In that case, a parent-teacher organization exerted great pres-

sure on a school board to terminate an elementary school principal. The group alleged that the principal was a racist. In its campaign against the principal, the group occupied her office for three consecutive days, organized a boycott that kept more than 80% of the students out of the school, distributed handbills, picketed the school, and delivered tirades against her at meetings of the Board of Education. The principal was eventually removed and transferred to another elementary school. In ruling that the citizens group had neither defamed nor conspired to violate the civil rights of the principal in its extensive campaign for her removal, the court stated:

> [The statements of the citizens' group] were made at meetings of the Board of Education or were part of a campaign to influence the Board. The statements made directly to the Board are governed by the *New York Times* standard under the holding of *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). Those made as part of the campaign to whip up public support in order to put pressure on the Board to remove Stevens are equally protected. See *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907–12, 102 S.Ct. 3409, 3422–25, 73 L.Ed.2d 1215 (1982); cf *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 371–76 (7th Cir.1987). The first amendment prohibits efforts to ensure "laboratory conditions" in politics; speech rather than damages is the right response to distorted presentations and overblown rhetoric. A campaign to influence the Board of Education is classic political speech; it is direct involvement in governance, and only the most extraordinary showing would permit an award of damages on its account.

*Stevens,* 855 F.2d at 403.

Under these principles, the actions of KEA and Gist are protected by the first amendment and cannot provide the basis for liability. The fact that the school board was acting in what Eaton calls a "quasi-judicial capacity" in considering Eaton's termination does not change this determination for several reasons. First, the *Noerr–Pennington* doctrine applies to judicial proceedings. *Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277 (1983); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *Opdyke Inv. Co. v. City of Detroit,* 883 F.2d 1265, 1273 (6th Cir.1989). Second, even though a school board may sometimes act as a quasi-judicial body, that fact does not transform it into a court. *Joseph v. Patterson,* 795 F.2d 549, 558 (6th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987). Finally, even if KEA and Gist had taken these actions outside of a court of law, they certainly could not be punished for efforts to affect the court's decision in the absence of clearly defined laws proscribing the conduct. *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). No such laws exist here.

In sum, we hold that the district court erred in refusing to grant JNOV in favor of KEA and Gist. The defendants cannot be held liable for their actions in this case, since those actions were protected by the first amendment rights to speak freely and to petition the government.

Since our ruling today is founded on the first amendment, we need not address the other arguments presented in this case. We thus express no opinion on whether the facts in this case, even absent constitutional considerations, could support liability for a conspiracy to violate Eaton's procedural and substantive due process rights, or could amount to the tort of outrageous conduct under Kentucky law.

IV

For the reasons given, we REVERSE the judgment of the district court and VACATE the award of damages to Eaton.