Robert A. TARPLEY, Plaintiff–Appellant,

v.

Shawn JEFFERS, Allen Pigg, Alice Kerns, et al., Defendants– Appellees.

No. 95–2084.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1996.

Decided Sept. 19, 1996.

Haw. 478, 483, 653 P.2d 1155, 1159 (1982).

Mary L. Leahy (argued), Cheryl R. Jansen, Springfield, IL, for plaintiff–appellant.

Jeffrey D. Colman (argued), Edward J. Lewis, II, Melissa S. Widen, Jenner & Block, Chicago, IL, for Shawn Jeffers, Allen Pigg, Alice Kerns, James R. Edgar and Janis Cellini.

Edward J. Lewis, II, Melissa S. Widen, Chicago, IL, for Natalie Bayles, Dan Shroyer.

Bruce Stratton, Stratton & Nardulli, Springfield, IL, for Frank Keistler, Jr., Union County Republican Central Committee.

Before CUDAHY, FLAUM and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiff Tarpley appeals the grant of summary judgment in his suit under 42 U.S.C. § 1983 alleging state intrusion into his right to freedom of political association. In 1992, Tarpley applied for a permanent job as a power plant maintenance worker at a state-run facility. He was denied the job in favor of Harold Blessing. Blessing had been filling the job for several months on a temporary basis, upon the recommendation of the Chairman of the Union County Republican Central Committee, Frank Keistler. The interim appointment was made after the two permanent power plant maintenance worker positions were left vacant due to the promotion of one of the workers and the serious illness of the other.

Several individuals, including Tarpley and Blessing, were interviewed for the permanent position. Blessing was awarded the permanent position, at least partly because of the experience he had gained in the preceding months. Tarpley alleges that Blessing obtained the temporary position as well as the permanent one because of his affiliation with the Republican party, in violation of Tarpley's First Amendment right to freedom of political association. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

The district court granted summary judgment to all defendants as to both the temporary and permanent hiring decisions. It held, with respect to the allegation of direct bias in the permanent hiring process, that, because several other interviewees received higher rankings, Tarpley had failed to raise an issue of material fact whether he would have been granted the job in a party-blind hiring process. We agree. We also find that Tarpley did not present sufficient evidence of the existence of a deliberate scheme to avoid *Rutan* by using the interim position as a ploy to fill the permanent position. Thus the district court correctly granted summary judgment to all defendants on the claim of direct bias in hiring for the permanent position.

Turning to the temporary hiring, the first question presented is one not raised by any of the parties nor addressed by the district court. It is the issue of standing. Tarpley, as a subsequent applicant for the job (on a permanent basis), certainly acquired standing later, but was he a proper plaintiff to challenge the temporary award? The record before us is not sufficient to allow us to determine whether Tarpley has standing to challenge the temporary hiring process. To have standing, Tarpley must demonstrate an "'injury in fact,' by which [is meant] an invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993), quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The standing issue here is analogous to that arising in *Northeastern Florida,* which involved a challenge by an association of general contractors to a program giving preferential treatment to minority-owned businesses. There the Supreme Court clarified that:

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

*Northeastern Florida,* 508 U.S. at 666, 113 S.Ct. at 2303. Thus, for standing purposes, Tarpley need not prove that, had the hiring decision been untainted by political bias, he would have obtained the position. Here, as "in the context of a challenge to a set-aside program, the 'injury-in-fact' is the inability to compete on an equal footing...." *Id.*

In *Northeastern Florida,* the Court held that, to establish standing, a majority contractor "need[ed] only [to] demonstrate that it [was] able and ready to bid on contracts and that a discriminatory policy prevent[ed] it from doing so on an equal basis." *Id.* Thus

Tarpley could presumably establish standing to challenge the hiring process for the temporary positions by showing that he would have been "able and ready" to apply for the temporary position, had he not been prevented from doing so by the patronage hiring practice. This is a jurisdictional question, and we remand to the district court for a finding of jurisdictional fact whether these requirements were met.

Looking beyond the jurisdictional claim, we note that the district court opined that patronage hiring for temporary positions violates the First Amendment, but held that this principle was not clearly established. Thus, the court ruled that the state defendants had qualified immunity with respect to the temporary position. The district court also concluded, for reasons which are unclear, that the party defendants should be granted summary judgment as to the temporary position as well.

Since argument was heard in the present appeal, the Supreme Court has decided *O'Hare Truck Service, Inc. v. City of Northlake*, —— U.S. ——, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). That decision overruled earlier case law of this circuit which had distinguished independent contractors from government employees. Contrary to our earlier precedent, the Court held that the First Amendment bars patronage hiring of independent contractors as well. The Court reasoned:

We cannot accept the proposition, however, that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgement of First Amendment rights described in his complaint.

*Id.* at ——, 116 S.Ct. at 2358.

Based on the categorical analysis employed by the Court in *O'Hare Truck Service*, it is not readily apparent how exceptions to the patronage ban are to be justified unless some sort of de minimis principle applies. However, there are many kinds of temporary employment, and a ruling on one may not implicate all the others. Here we are dealing with a job that is awarded on a temporary basis preliminarily to its being filled permanently. It would be entirely premature to rule definitively on this sort of employment until we are assured that we are confronted with a live controversy. But we believe that *O'Hare Truck Service*, in conjunction with earlier cases, provides an adequate guide for the district court on remand, should guidance be required. We note, without further comment, that the plaintiff here has made the point that the plaintiffs in *Rutan* included a temporary employee, Ricky Standefer. But, of course, the issue of temporary status was not raised in *Rutan*.

It is true that, by their nature, temporary jobs can rarely be awarded fully on the basis of "merit" since time to determine it is frequently not available, nor does the subject often justify the sort of inquiry required for a "merit selection." Thus, family relationships, friendship, lodge membership or any one of a thousand other factors may affect the selection. However, temporary positions—particularly interim replacements for permanent employees such as the position at issue here—are valuable. Denial of these valuable positions because of political affiliation may very well invoke the same concerns with chilling of First Amendment protected activity as those underlying *Rutan* and *O'Hare Truck Service*.

█ In any event, because this is the first time the question of the constitutionality of patronage hiring of temporary employees has been presented to us, we agree that the state officials would be protected by qualified immunity as to the temporary position. The party defendants, however, have no basis for claiming qualified immunity. Rather than filing their own memorandum in support of summary judgment, the party defendants relied completely on the memorandum filed by the state officials. The portion of that memorandum dealing with the temporary position focused entirely on two arguments: that *Rutan* did not apply to the temporary position and that the state officials were protected by qualified immunity. The second argument is irrelevant to the party defendants' potential liability and the first is now impacted by *O'Hare Truck Service*. The grant of summary judgment with respect to the party defendants must be reversed and the matter remanded for a determination of standing and, if there is standing, of the merits.

## Background

In 1990 the Supreme Court, in *Rutan*, decreed that the use of political party affiliation as a criterion for public employment violated the First Amendment unless it was a job (generally involving policymaking) for which political affiliation was an appropriate requirement. Following that decision, Illinois state officials announced that all further hiring decisions would be based "on the merit and qualifications of the candidates," Administrative Order No. 2 (1990), except, of course, where the position fell under the *Rutan* policymaking exemption. On remand of the *Rutan* case, a Settlement Agreement between the plaintiffs and the Illinois officials was entered as the final judgment in the case. That Agreement required the State to publish a list of positions which were exempt from the *Rutan* holding.

In mid–1991, state officials decided that many temporary positions would be treated as exempt from the *Rutan* holding. These positions, including the interim power plant maintenance worker job involved here, were never included in the "exempt list" prepared in compliance with the Settlement Agreement.

The power plant position at the Choate Mental Health Center, which is operated by the Illinois Department of Mental Health and Developmental Disabilities, became vacant in the spring of 1992. Prior to that time, there were two permanent power plant maintenance workers at the facility. The position into which Blessing was eventually hired became available when one of these workers was promoted and the other developed a serious illness. One of the defendants, Alice Kerns, filled out a requisition form to fill one of the power plant positions on a permanent basis. The position was initially authorized only on a temporary basis, however.[1] The defendants contend that the temporary hiring was a stopgap measure, meant to provide for the emergency needs of the Choate Center long enough for the more prolonged permanent hiring process to be completed. Plaintiffs, on the other hand, charge that the temporary hiring was a deliberate scheme to circumvent the strictures of *Rutan*.

In any event, Roger Blessing was hired in June 1992 on the recommendation of Frank Keistler, head of the Union County Republican Central Committee. No interviews were conducted for the interim position and it was not publicized in any way. Blessing apparently performed extremely well in the interim position, which required that he put in very long hours. What relation, if any, Tarpley bore to the temporary position is unclear. The record contains no evidence whether, had he known of the position, he would have been interested in it. One might infer that, if he was interested in the permanent job, he would also have sought the temporary one. But this is for the district court and not for consideration on appeal.

On September 15, 1992, permission was granted to fill the power plant position on a permanent basis. The intent to fill the permanent vacancy was also never advertised to the public. Tarpley heard about the position through the grapevine, however, and applied. Of eighteen applications that were collected from previous submissions to the Choate Center, ten were rejected for lack of qualifications. The eight remaining applicants were interviewed.

The interviews were conducted by Allen Pigg and Dan Schroyer, the Chief Engineers for the Choate Center and the Department of Mental Health, respectively. Pigg was Blessing's direct supervisor in the interim position. The interviews consisted of a series of eighteen predetermined questions, responses to which were scored separately by Pigg and Schroyer on a 1-to-10 scale. After

---

1. Because there were two positions available, there is some dispute whether the position for which permanent hiring authorization was requested is the one into which Blessing was hired. Defendants contend that the request for a permanent hire was made after only one of the positions became vacant and that, when the second position also became vacant, a temporary hire was requested. Whichever position Blessing eventually took (and whether or not it is possible to distinguish the two) the undisputed facts are that the request for a permanent position was made, Rec. Doc. 33 para. 27; authorization to fill the position on a temporary basis was received, Rec. Doc. 33 para. 31; and *both* positions were initially filled by temporary workers who eventually obtained the permanent positions. Def. Supp.App. at S.O. A–30; Rec. Doc. 91, Exh. U.

the interviews were completed, a weighted average of Pigg's and Schroyer's scores was computed in order to assign an overall score to each candidate. The weighting procedure resulted in a maximum possible score of 49. Blessing received a score of 32.5. Tarpley received a score of 21.0, placing him sixth among the eight interviewees.

Tarpley criticized the interview process through the report of an expert witness, Dr. Charles Hobson. Dr. Hobson opined in his report that, among other things:

1) Blessing's 6–month temporary position gave him an overwhelming advantage over Tarpley in the interview process.

2) The two raters demonstrated a systematic, consistent, and non job-related negative bias in evaluating Tarpley's answers, as compared to Blessing's.

Rec. Doc. 91, Exh. U.

The record contains the questions asked, Pigg's and Schroyer's notes and the scoring of each question with respect to Blessing and Tarpley. This evidence strongly suggests that the interview process was skewed in Blessing's favor. For example, one of the hiring criteria, which determined about eight percent of the overall interview score, was that "the candidate must have a working knowledge of the maintenance worker position." One of the two questions under that heading was "Give a brief description of what you think this position[']s duties and responsibilities consist of and the impact they have on the facility or organization as a whole." An individual, such as Blessing, who had held the very position that was the subject of the interview would obviously have a great advantage in this category. Not surprisingly, Blessing received a score of 19/20 in this category, while Tarpley received a score of only 9/20. In fact, Blessing's previous experience in the power plant maintenance worker position was reflected in his responses to at least seven of the eighteen questions asked during the interview. Together these questions accounted for about thirty percent of the possible tally and were responsible for more than a third of the difference in scores between Tarpley and Blessing.

Blessing's seemingly inevitable advantage stemming from prior experience in the job is not the only plausible criticism of the interview scoring. Beyond observing that the interview score was based, in part, on knowledge that only someone who had previously held the job would be likely to have, the peruser of the interview notes and scores is left with the impression that, on some questions at least, scores may have been arbitrarily skewed to Blessing's advantage. When asked, "Can you handle having more than one boss?", for example, Tarpley responded "yes" and received 3.5 points. Blessing responded "no problem" and received 7.5 points. Questions to which Blessing and Tarpley gave essentially equivalent responses made up a quarter of the total score and were responsible for over half of the difference between Blessing's and Tarpley's scores. All in all, questions which drew upon Blessing's experience in the interim position and questions which garnered disparate scores for comparable responses apparently accounted for nearly ninety percent of the difference between the two candidates' scores. Scores on some of the remaining questions were also arguably manipulated to Blessing's benefit.

At the conclusion of the interview process, Blessing was recommended for and awarded the permanent position. The "Employment Decision Form" explained the reasons for hiring him:

> Candidate now employed at Power Plant on temporary basis, he is knowledgeable of position, has proved he can perform job and scored highest in total score conducted by Rutan Interview, we the interviewers feel he is the most qualified for position.

It is thus uncontested that Blessing's experience in the interim position gave him an edge in the selection process for the permanent position. Further, the manner in which the interviews were scored might lead a reasonable jury to infer that the interview scoring was structured so that Blessing would receive a high score.

Six other applicants were interviewed for the permanent position. Their scores on the interview questions and the interviewers' notes from their interviews are not in the record before us, precluding any comparison

of the scoring of these interviews with those of Tarpley or Blessing.

Pigg and Schroyer have both sworn in affidavits that:

> At no time during the interviews did we ask, nor did any applicant state, whether or not he or she was affiliated with or supported a political party. Political affiliation was irrelevant to the interview and selection process, and was not considered at any point in which I was involved. [Neither] Frank Keistler [nor] any official of any political party attempt[ed] to influence my evaluation of the candidates for the power plant maintenance worker position.

Def. Supp.App. at A–34 & A–37. It is, of course, possible that any bias in favor of Blessing was a result, not of political motivation, but of simple predilection based on an understandable desire to keep a good employee. Tarpley has presented no direct evidence that it was political affiliation, rather than some other motivation, which produced any bias manifested in the permanent hiring process.

### Analysis

Analysis of Tarpley's challenges requires a three-level inquiry: First, is patronage hiring unconstitutional in the circumstances of this case? Second, if so, was the unconstitutionality clearly established or are the state defendants entitled to qualified immunity? Third, did Tarpley suffer an injury by virtue of the defendants' actions?

We have already noted our approach to the first two questions. *O'Hare Truck Service* employs a categorical analysis, under which exceptions to the patronage ban are not readily apparent. But we also agree with the defendants that, whatever may be the constitutional status of patronage hiring for temporary positions, it was not clearly established at least prior to *O'Hare Truck Service*. The question of qualified immunity requires a bit more discussion, however.

### I. Qualified Immunity

 As we have said, at least until the Supreme Court's recent decision in *O'Hare Truck Service*, the applicability of *Rutan* to temporary positions was not clearly established. Therefore, qualified immunity is generally available to state officials who have awarded temporary jobs on a patronage basis. However, Tarpley suggests two ways in which the present case might, in principle, be distinguished from the run of the mill. First, Tarpley does not allege only that hiring Blessing for the interim job violated his constitutional rights because temporary positions may not be filled on a patronage basis in general. Tarpley also contends that the award of the temporary position gave Blessing an unfair advantage in competing for the permanent position. To the extent that this advantage was simply an inevitable by product of the patronage hiring process for the temporary position, the state officials are protected by qualified immunity from liability on this theory as well. However, Tarpley also contends that the state officials chose to fill the position on a temporary basis, not because there was an emergency need for a power plant maintenance worker, but as part of a scheme to circumvent the dictates of *Rutan* with respect to the permanent position.[2] There is no qualified immunity from such a charge. However, as we discuss below, Tarpley has not produced sufficient evidence of the existence of such a scheme to withstand summary judgment.

Second, Tarpley has emphasized certain Illinois events which might suggest that, even if qualified immunity were available elsewhere, it should not be available in Illinois. *Rutan* itself, of course, involved Illinois state employment practices. Classifying jobs as covered by or exempt from *Rutan* demanded considerable attention from Illinois officials during the period just prior to and during the events which precipitated this lawsuit. As a response to the Supreme Court's *Rutan* decision, then-Governor James Thompson issued several orders to

---

2. Interestingly, the Supreme Court noted the potential for such schemes in the independent contractor context; stating that "[r]ecognizing the distinction in these circumstances would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs." *O'Hare Truck Service,* —— U.S. at ——, 116 S.Ct. at 2359.

ensure compliance with its dictates. These orders stated clearly that "no hiring or other personnel decisions—including promotions, transfers or recalls from layoff—may be decided on the basis of the candidate's party affiliation or support." Upon taking office in 1991, Governor Edgar issued an order reaffirming this policy.

The *Rutan* case eventually resulted in a court-approved settlement agreement. As part of that settlement, state officials were to compile a list of "exempt positions." A notice was to be published in each department which would include the list of positions in that department which were exempt from *Rutan*. The notice was to state, in part, that "[t]he *Rutan* decision does not apply to positions for which political affiliation or support is an appropriate job consideration" and to be followed by a list of exempt positions. Temporary positions, including the one at issue here, were not included in these published lists, even though the decision to exempt temporary positions from the procedures required by the *Rutan* settlement was made in mid–1991.

Tarpley implicitly invites us to speculate as to why, if Illinois state officials genuinely believed that temporary positions were exempt from the *Rutan* holding, such positions were never posted on the exempt lists. This might be an interesting question if we were currently conducting an inquiry into compliance with the settlement in the *Rutan* case. Here, however, our job is not to speculate about allegations of non-compliance with a settlement in a another case.

In sum, we conclude that the district court correctly granted qualified immunity to the state officials as to the hiring for the temporary position.

## II. The Summary Judgment Decisions

■ The third question—whether Tarpley was injured by the unconstitutional patron-

age hiring practice—must be analyzed within a burden-shifting framework. *Gooden v. Neal*, 17 F.3d 925 (7th Cir.1994), cert. denied — U.S. ——, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). At trial, the employee must first prove by a preponderance of the evidence that political affiliation was a "motivating factor" in the employment decision. If the employee carries that burden, the employer then bears the burden of showing that "it would have reached the same decision as to respondent's [ ]employment even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. at 576. In order to avoid summary judgment, therefore, the employee must rebut whatever evidence the defendants put forward, in order to show that there is an issue of material fact.

Tarpley presents three basic theories of liability to consider: 1) that the permanent hiring decision was based directly on political affiliation, thus directly depriving Tarpley of the position; 2) that, by filling the interim position via a political recommendation, the defendants injured Tarpley by depriving him of a fair chance at the permanent position; and 3) that Tarpley was unconstitutionally deprived of the temporary position in and of itself. Since the defendants do not contest that the temporary position was filled on a patronage basis, the success of the third theory depends primarily on the district court's resolution of the standing issue and its related disposition of the merits.[3] We therefore focus here on the two theories related to the permanent position.

## A. The Direct Bias Theory

■ With respect to the claim of direct bias in the permanent hiring process, there are two questions we must answer: 1) Is

---

**3.** Of course, the third theory is viable only against the party defendants because of the state defendants' qualified immunity. Tarpley will be required to prove that the party defendants did more than simply make a recommendation to the state officials that Blessing be hired. As the district court noted in its ruling on the party defendants' motion to dismiss, Tarpley would have to show that the party defendants acted

under color of state law by working in concert with the state officials to deprive him of his First Amendment rights. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This issue was not raised at summary judgment, the party officials simply having adopted the motion for summary judgment filed on behalf of the state defendants. Rec. Docs. Nos. 57, 62 and 63.

there an issue of material fact whether Blessing was hired for the permanent position directly because of his political affiliation? 2) Is summary judgment warranted, in any event, because the defendants have demonstrated that Tarpley would not have been awarded the position even in the absence of political considerations?

Tarpley argues that there is sufficient evidence of bias in the interview process for the permanent job to raise a triable question whether Blessing was intentionally selected because of his political affiliation. As we have already described, the evidence of the difference in interview scores between Tarpley and Blessing is certainly sufficient to raise a plausible inference of bias. The difficulty for Tarpley is that he has presented no direct evidence that this bias was *politically* motivated, rather than being motivated by favoritism of some other sort.

Indeed, the interviewers, Pigg and Schroyer, have presented affidavits affirming that they did not take political affiliation into account in their decisionmaking process. Contrary to these assertions, however, is the fact that there was an announced state policy of appointing temporary workers through political channels. It may be a reasonable inference that, as supervisors, Pigg and Schroyer at the very least knew that Blessing was not originally chosen through any merit-based selection process. These points raise sufficient doubt as to the credibility of Pigg's and Schroyer's attestations of ignorance concerning Blessing's political credentials that we

could not uphold summary judgment on the question of "motivating factor."

Be that as it may, however, Tarpley has failed to rebut the defendants' evidence that other applicants, besides Blessing, were more qualified than he. Even if the interview process was biased in Blessing's favor, four other applicants for the position received higher scores than Tarpley's and, thus, would presumably have been preferred to Tarpley, even if Blessing had not been in the running for the position.[4] Tarpley has provided us with no information about these candidates which could support a jury finding that their scores were unjustified by their qualifications or that they were favored over Tarpley for political reasons.[5]

Having seen the apparently tenuous relationship between Tarpley's and Blessing's interview scores and their responses to the interview questions, one might speculate that some of the other applicants' scores were not meaningful. Unfortunately for Tarpley, however, speculation does not provide grounds for reversing a grant of summary judgment. Tarpley has produced no *evidence* whatsoever to rebut the defendants' argument that, even if *Blessing's* scores were artificially raised, the superior scores of the other candidates demonstrate that Tarpley would not have been selected. Summary judgment was thus properly granted on this claim.

### B. The Unfair Advantage Theory

As we have already pointed out in our discussion of qualified immunity, the unfair

---

4. In arriving at the grant of summary judgment on this point, the district court misstated, in part, the *Mt. Healthy* test. The district court said that "Tarpley is not entitled to a remedy if he cannot show that he would have been hired if Blessing's political party affiliation had not been used as a factor." Dist. Ct. Op. at A–10. This phrasing of the test places the burden of proof incorrectly on Tarpley. In fact, if Tarpley shows that political affiliation was a "motivating factor" in the hiring decision, *the defendants* must prove that Tarpley would not have been hired otherwise.

5. We note that Tarpley would not necessarily have had to prove that the interviewers took his political affiliation or that of the other candidates into consideration when scoring the responses to the interview question. As we just noted, the *defendants* are required to prove that Tarpley would not have received the job even if Blessing

was not politically favored. Suppose, for example, that Tarpley had been able to produce evidence that, as a means to a predetermined outcome of hiring Blessing, Blessing was given a high score and everyone else was given a meaningless score. In such a case, defendants could not meet their burden of proof simply by pointing to the meaningless scores. A reasonable inference could be made that meaningless scores were assigned only because the entire interview process was a sham. If the scores were randomly assigned to the interviewees solely for the purpose of guaranteeing that Blessing would prevail, the scores of other interviewees would not provide evidence that they would have been preferred to Tarpley in an interview process untainted by bias. Defendants would then have the burden to prove that Tarpley would not have prevailed in a meaningful interview process.

advantage theory comes in two flavors. The state officials are entitled to qualified immunity if any unfair advantage in the permanent hiring process was simply a natural outgrowth of the patronage hiring for the temporary position. However, if the award of the temporary position to Blessing was part of an intentional scheme to evade *Rutan's* restrictions on filling the permanent position, both the party defendants and the state officials would, in principle, be liable. Thus we must determine whether Tarpley has raised an issue of material fact regarding the existence of such a scheme.

The party defendants are, of course, not shielded by qualified immunity and, allegations of a scheme aside, bear the burden of proving that Tarpley was not deprived of the permanent position solely because of the predictable advantage Blessing garnered by filling the interim slot.

## 1. Existence of a Scheme

As evidence of the existence of a scheme, Tarpley points to the fact that the power plant maintenance positions were permanent positions both before and after the temporary appointments were made in 1992; to the fact that an initial request was made for a permanent hire; to the failure to publicize the availability of the permanent position; and to the skewing of the interview process in Blessing's favor.

The defendants respond to the allegations of a scheme in three ways: First, they argue that "there is no evidence in the record to suggest that prior temporary employment alone—without regard to performance in the job—provides any benefit or advantage for future job opportunities." Def. Br. at 43. This argument fails because, if Blessing was appointed to the temporary position as a means of ensuring him the permanent job, the mere fact that he could have lost the permanent job by not performing well in the temporary position does not cure the First Amendment violation. *Rutan* does not condone the hiring of political allies into permanent positions on a probationary basis on the rationale that they could lose the job if they botched up the probationary opportunity. If a temporary job is, in reality, a probationary

period for a permanent job, the impropriety of awarding it on a patronage basis follows from the ban on patronage hiring for the permanent position.

Second, the defendants argue that the court should reject the theory that an unconstitutional path to a prior job "taints" the experience obtained in that job. Id. at 44–45. The defendants are quite correct that a theory whereby "the job performance of any employee who was hired based on political considerations prior to the Supreme Court's *Rutan* decision on June 21, 1990, should not have been considered in subsequent personnel transactions because they were the beneficiaries of the alleged 'illegal' patronage scheme" would be unworkable. Def. Br. at 44. This theory is a straw man, however. Tarpley's theory is much narrower. He argues that *this particular temporary hire,* made after *Rutan,* was made *in order to* place a political ally in a permanent job without appearing to violate *Rutan.* While the defendants' caricature of Tarpley's theory may not be tenable, Tarpley's actual theory clearly is.

Third, the defendants argue that "the record is devoid of facts to support plaintiff's claim of a 'scheme' to avoid *Rutan.*" *Id.* at 48. While we do not agree that the record is "devoid" of such facts, we do conclude that the facts cited are insufficient. Tarpley has cited a laundry list of facts which he claims could support a *circumstantial inference* that a scheme existed. These facts, however, taken together, are insufficient to raise an issue of material fact concerning the existence of such a scheme. The circumstantial evidence presented may be sufficient to raise some eyebrows, but it is not sufficient to raise a jury question whether there was a scheme to circumvent *Rutan.*

Since there is not sufficient evidence to resist summary judgment as to the existence of a scheme and since the state officials are immune from suit as to the interim position unless Tarpley could prove such a scheme, summary judgment was correctly granted to the state defendants.

## 2. Unfair Advantage

■ Because the party defendants are not entitled to qualified immunity, Tarpley need not show that the political hiring for the temporary position was part of a deliberate scheme to avoid *Rutan* in order for them to be liable. As we have already discussed, the patronage hiring for the interim position involved here may have violated the *Rutan* prohibition in its own right. Tarpley contends that his rights were further infringed by the temporary hire because of the unfair advantage the temporary job inevitably bestowed on Blessing in the contest for the permanent position. Assuming, arguendo, that Tarpley has standing to contest the award of the temporary position, the party defendants will be liable for Tarpley's injury due to this unfair advantage, unless they can raise some other defense, such as failure to act under color of state law. As noted earlier, however, the party defendants made no argument on this point in their summary judgment submissions to the district court. Thus, the grant of summary judgment to the party defendants with respect to the temporary and permanent positions must be reversed.

## III. Conclusion

In conclusion, we reverse the district court's grant of summary judgment as to the party defendants with respect to the temporary hiring of Blessing into the power plant maintenance worker position and remand to the district court for further proceedings to determine whether Tarpley has standing to challenge the temporary hire. If Tarpley has standing, he may attempt to prove liability and injury arising from either the direct loss of the temporary position itself or, what is no doubt much more important to him, the loss of the opportunity to obtain a "leg up" in the competition for the permanent job.

The state officials are protected by qualified immunity on the temporary hiring claim and we affirm the grant of summary judgment to them. As to Tarpley's claims regarding the permanent hiring process, we find that he has not presented sufficient evidence either of a scheme to circumvent *Rutan* or that he was injured by any direct bias infecting the permanent hiring process. For this reason, we affirm the grant of summary judgment to the state officials on all claims.

AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.

FLAUM, Circuit Judge, concurring in the judgment.

I fully agree with the majority's conclusion that the plaintiff Robert Tarpley has failed to raise a genuine issue of material fact regarding whether he would have been awarded the permanent maintenance worker job in a "party-blind" hiring process. The four other interviewees that were ranked above Tarpley, though below Harold Blessing, rebut his claim that he would have gotten the job but for his politics. I also agree that Tarpley did not adequately substantiate his claim that the defendants used the temporary position as a way of getting the politically favored into a subsequent permanent position, i.e., that they engaged in a deliberate scheme to avoid the dictates of *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Furthermore and most significantly, I join the majority's conclusion that Tarpley has not yet established that he has standing to challenge the filling of the temporary position, since it is not clear that he would have been "ready and able" to apply for it had it not been filled by a patronage hiring.

At this point in the litigation, however, I am unable to join the majority opinion to the extent that it advances commentary on issues that are not before us for decision. I agree that if the district court determines that Tarpley can establish "injury in fact," and hence standing, to contest the temporary hiring, the court will have to address the challenging question of the legality of patronage hiring for temporary positions in light of the teachings of both *Rutan*, 497 U.S. 62, 110 S.Ct. 2729, and *O'Hare Truck Service, Inc. v. City of Northlake*, —— U.S. ——, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). Prudentially, I would refrain from currently exploring the possible parameters of this issue until assured of a live controversy. In addition, I would avoid engaging in any preliminary

fact-finding regarding the comparative validity of the Blessing and Tarpley interviews for the permanent position, particularly since this court concludes that the higher scores of four other interviewees (about which Tarpley submitted no evidence of bias) appropriately led to summary judgment against the plaintiff on this claim.

The party defendants in this case do not yet "bear the burden of proving that Tarpley was not deprived of the permanent position solely because of the predictable advantage Blessing garnered by filling the interim slot." *Supra* at 930. This issue does not arise until there is an initial adjudication that *Rutan* applies to temporary positions—an issue that, in my judgment, should only be addressed if Tarpley has standing in the first place. Therefore, because of the posture of the case before us, any unqualified endorsement of the majority's analysis must be reserved for another day.