Robert Alan TARPLEY,
Plaintiff–Appellant,

v.

Frank KEISTLER, Jr. and Union County Republican Central Committee, Defendants–Appellees.

No. 98–2369.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1999.

Decided Aug. 13, 1999.

Mary L. Leahy (argued), Springfield, IL, for Tarpley.

Bruce Stratton, Stratton & Nardulli, William F. Moran (argued), Stratton, Stone, Kopec & Sturm, Springfield, IL, for Keistler, Jr.

Bruce Stratton (argued), Stratton & Nardulli, William F. Moran, III, Stratton, Stone, Kopec & Sturm, Springfield, IL, for Union County Republican Central Committee.

Before CUDAHY, FLAUM and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

For a quarter century now, well-meaning Illinois citizens periodically have turned to the courts in attempts to rid the state of an age-old rite: rewarding political supporters with the spoils of power, notably, but not exclusively, public employment. *See, e.g., O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996); *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Shakman v. Democratic Org. of Cook County,* 569 F.Supp. 177 (N.D.Ill.1983). Despite these efforts, patronage hiring is alive and well in Illinois. *See* Cynthia Grant Bowman, THE LAW OF PATRONAGE AT A CROSSROADS, 12 J.L. & POL. 341, 356–58 (1996). In this case, Robert Tarpley takes on the patronage machine. He mounts yet another challenge to yet another scheme designed by the party in power to hire workers who share its political convictions. We considered his claims once before, leaving open some possibility of victory. *See Tarpley v. Jeffers,* 96 F.3d 921 (7th Cir.1996). This time, Tarpley's effort is again gallant, but falls short. We affirm the district court's order granting summary judgment to the defendant.

## I.

The facts of the case have not changed since the first time we considered it. *See id.* at 925–27. We recite them again here for ease of reference.

In 1990, the Supreme Court decreed that the use of political party affiliation as a criterion for public employment violates the First Amendment unless, generally speaking, the job involves some element of policy-making. *See Rutan,* 497 U.S. at 74–76, 110 S.Ct. 2729. In response, the then-Governor of Illinois, Jim Thompson, issued orders requiring the state to base all hir-

ing decisions for jobs covered by *Rutan* on merit and qualifications. The state also agreed to publish a list of *Rutan*-exempt positions as part of the settlement agreement with the *Rutan* plaintiffs. In 1991, Illinois's new Governor, Jim Edgar, determined that *Rutan* did not reach decisions about employment in temporary public jobs, and his administration went about filling temporary positions with Republican loyalists. To this end, administration officials staged a series of meetings at which they informed Republican activists that political affiliation could be considered in filling vacancies for temporary positions. Frank Keistler, the long-time Union County Republican Central Committee Chairman, attended a number of these meetings. Administration representatives told Keistler and other attendees .that temporary positions were exempt from the strictures of *Rutan* and gave them a list of contacts in various departments to whom they could forward recommendations to fill vacant temporary slots.

The Choate Mental Health Center, a state-operated hospital located in Union County, employed two power plant maintenance workers. In spring 1992, following the death of one and the promotion of the other, Choate sought to fill both vacancies on a permanent basis. The Department of Mental Health, which managed Choate, authorized Choate to fill the positions on a temporary basis only. Keistler got wind of the temporary vacancies and called Natalie Bales, a Department of Mental Health personnel officer, to recommend for one of the jobs Harold Blessing, a Republican precinct worker. Keistler also spoke with Janice Cellini in the Governor's Office of Personnel about Blessing's interest in the position. Following the normal procedures used to fill all vacancies, Bales called her contact in the Governor's office (not Cellini) about the Choate position and was given Blessing's name. Bales then forwarded Blessing's information to Alice Kerns, the personnel officer at Choate. Blessing started work four days later. No interviews were conducted for the temporary position, and it was not publicized in any way.

Later that year, the Department made the maintenance positions permanent. Neither the Department nor Choate (nor any other state agency) advertised the job. Blessing and eight others, including Tarpley, interviewed for the position. Blessing got the job, at least in part because he had gained valuable experience during his months as a temporary employee in the same position.[1]

Tarpley sued under 42 U.S.C. § 1983 alleging state intrusion into his First Amendment right to freedom of political association. Specifically, he claimed that Blessing got the temporary and consequently the permanent position because Blessing was a Republican, violating the clear mandate of *Rutan*. Tarpley named both state officials and Republican party functionaries as defendants. The district court granted summary judgment in favor of all defendants with respect to the hiring decision for the permanent position, and we affirmed. *See Tarpley*, 96 F.3d at 928–30. We also held that the state defendants were protected by qualified immunity with respect to bias claims related to the temporary position. *See id.* at 927–28. However, we reversed the district court's grant of summary judgment in favor of the Republican Party defendants on the temporary hiring claims and remanded the case "to determine whether Tarpley has standing to challenge the temporary hire. If Tarpley has standing, he may attempt to prove liability and injury arising from either the direct loss of the temporary position itself or, what is no doubt much more important to him, the loss of the opportunity to obtain a 'leg up' in the competition for the permanent job." *Id.* at 931.

On remand, the district court determined that Tarpley had standing. Keistler

---

1. As we have noted elsewhere, the interview process for the permanent position was not beyond scrutiny. *See Tarpley,* 96 F.3d at 925–26.

then moved for summary judgment on the ground that he never acted under color of state law, attaching an affidavit to his motion in which he generally denied having any power to make state government hiring decisions and denied the existence of any conspiracy giving him such authority. The district court granted the motion, holding that Keistler only recommended that Choate hire Blessing and that this recommendation was not enough to establish state action: "the plaintiff must at least offer admissible evidence that the party defendants did more than simply advocate that the State hire Harold Blessing. In fact, the party defendants must have a hand in actually hiring Harold Blessing based upon Blessing's political affiliation." Appellant's Br. at A–7 (Dis. Ct. Mem. & Ord., Apr. 30, 1998). The district court further held that "[i]f the plaintiff has offered no admissible evidence from which a reasonable jury could determine that the party defendants had the authority to hire Robert Alan Tarpley or Harold Blessing, then the party defendants cannot be liable." Id. at A–8 (Dis. Ct. Mem. & Ord., Apr. 30, 1998). The district court relied heavily—almost exclusively, in fact—on Vickery v. Jones, 100 F.3d 1334 (7th Cir.1996), cert. denied, 520 U.S. 1197, 117 S.Ct. 1553, 137 L.Ed.2d 701 (1997).

■ Tarpley again appeals. We review the district court's grant of summary judgment de novo, using the same standards as the district court and viewing the evidence in the light most favorable to the non-moving party. See, e.g., Sheik–Abdi v. McClellan, 37 F.3d 1240, 1243 (7th Cir. 1994). Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See FED. R.CIV.P. 56(c).

## II.

■ Section 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. A § 1983 plaintiff must show, then, that a defendant acted under color of state law. To state a § 1983 claim based on a Fourteenth Amendment violation—as here, where Tarpley claims that Keistler violated his First Amendment rights as applied to the states through the Fourteenth Amendment—the challenged conduct must also constitute state action. These two requirements—color of law and state action—are functionally equivalent. See, e.g., Thomas v. Pearl, 998 F.2d 447, 450 (7th Cir.1993).

■ State action is not limited to the conduct of state officials; the conduct of private parties can, under certain circumstances, constitute state action. The Supreme Court has articulated a number of tests to determine whether a private party should be considered a state actor. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (listing various tests). All of the tests, despite their different names, operate in the same fashion: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); see also Dunham v. Frank's Nursery & Crafts, Inc., 919 F.2d 1281, 1284 (7th Cir.1990).

■ Several factual scenarios already considered by the Supreme Court are particularly instructive in the matter at bar. Injured parties can attempt to prove that a private party conspired with state actors to deprive them of their constitutional rights. In Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), for example, a white school teacher alleged that a restaurant had conspired with the local police to deny her service in

the restaurant and to later arrest her for being in the company of her black students. The Court held that the "involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of [the teacher's] Fourteenth Amendment equal protection rights...." *Id.* at 152, 90 S.Ct. 1598. Similarly, in *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), the Court considered a claim that "an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge" and concluded that "[u]nder these allegations, the private parties conspiring with the judge were acting under color of state law...." *Id.* at 28, 101 S.Ct. 183. Another illustrative case, *NCAA v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), did not involve a conspiracy but instead presented the question whether a university's "actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." *Id.* at 193, 109 S.Ct. 454. The university had disciplined its basketball coach pursuant to an NCAA investigation. The Supreme Court closely examined the relationship between the university and the NCAA, concluding that, because the university had retained authority to withdraw from the NCAA and ignore its recommendations, the NCAA had not acted under color of state law. *Id.* at 193–96, 109 S.Ct. 454.[2] These are but a few of the many cases addressing tricky state-action questions. In each, the answer is situation-specific and fact-driven. *See Dunham*, 919 F.2d at 1284.

■ Keistler believes that this Court has already addressed the *exact* situation presented by this case and accordingly

argues without much elaboration—his brief contains only seven sentences of argument—that the district court correctly relied upon *Vickery*. That case is remarkably similar to this one. Illinois County Republican chairpersons recommended candidates for temporary highway maintainer positions, and Vickery received one of the temporary appointments during his brother's tenure as a chairman. When a new chairman took over, Vickery was not re-appointed. He sued several state actors as well as Republican Party officials "alleging that his failure to be appointed to a temporary highway maintainer position violated his rights...." *Vickery*, 100 F.3d at 1336. The district court dismissed the case against the party defendants for failure to state a claim upon which relief could be granted. Vickery appealed, and this Court affirmed. We held that "[i]f the action prohibited under *Rutan* is the hiring, promoting, transferring or recalling of an individual based on his or her political association, since the Party Defendants did not hire, promote, transfer, or recall anyone, their screening or recommending the hiring of employees for highway maintainer positions is not the same as being 'jointly engaged with state officials in the prohibited action.'" *Id.* at 1344 (quoting *Adickes*, 398 U.S. at 152, 90 S.Ct. 1598). Employing the analysis articulated in *Tarkanian*, we further found that "[p]hone calls whereby the Party Defendants made suggestions as to the filling of temporary positions simply do not suffice to satisfy [the state action requirement], for it is noncontroverted that the Party Defendants had no actual hiring authority and did not make the actual employment decision." *Id.* at 1345.

2. The Supreme Court also noted that "[i]n the *typical* case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action.... [That is,] whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *Tarkanian*, 488 U.S. at 192, 109 S.Ct. 454

(citations omitted) (emphasis added). To the extent that the *Tarkanian* situation is atypical, so too are the conspiracy cases—*Adickes* and *Dennis*—because in both cases the state actor's actions unquestionably caused the injury. In both cases, the ultimate issue was whether the private party had so injected itself into the state action that it would be held liable for the injuries caused by that action.

■ Tarpley offers two primary arguments in response, each of which is not without some merit. He first argues that Keistler's proposed test (lifted directly from *Vickery*) elevates one factual consideration (whether a party had "actual hiring authority") over all· others. Lack of ultimate power to hire is not conclusive, Tarpley asserts, nor is the state actor's freedom to act in a way contrary to that suggested by the non-state actor. To the extent that Keistler reads some language in *Vickery* to preclude a plaintiff from pursuing a § 1983 claim against a private party absent evidence that the private party had the actual legal authority to take the action which caused the injury, he is incorrect. Such an approach would make one factual consideration determinative. But, to repeat, the Supreme Court has emphasized repeatedly that courts must decide the state-action issue on a case-by-case basis considering *all* of the circumstances. *See, e.g., Lugar*, 457 U.S. at 939, 102 S.Ct. 2744.[3] In *Tarkanian*, the Supreme Court focused on the fact that the university retained the authority to reject the NCAA's recommendations about disciplining the coach. 488 U.S. at 194–98, 109 S.Ct. 454. This was but one of the relevant facts, however, and *Tarkanian* does not purport to overrule three decades of cases which have examined the totality of the circumstances in making a state-action determination. Each case is different, and each case must be considered on its own merits.

■ Here, · Tarpley distinguishes his case from Vickery's, asserting that he has produced probative evidence which suggests that the state conspired with Republican Party officials. Tarpley next complains, however, that Keistler's reading of *Vickery* would appear to bar the pursuit of conspiracy cases against private parties. To the extent that *Vickery* can be read to foreclose a plaintiff from pursuing a § 1983 case against a private party based on a conspiracy theory, it directly conflicts with the time-tested holdings of *Adickes* and *Dennis*. Those cases remain vibrant law, *see, e.g., Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir.1992); *Briscoe v. LaHue*, 663 F.2d 713, 722–23 (7th Cir.1981), and Tarpley is free to pursue his theory of conspiracy.

And he has produced some evidence from which a jury might conclude that the party defendants conspired with the state. Keistler attended meetings with state employees, including representatives of the Governor's office; he spoke with the Governor's office about Blessing's interest in the position; and he spoke with his Department personnel contact, who relayed Blessing's name to the Governor's office. The Governor's office forwarded only one candidate's name—Blessing's—to the Choate personnel officer with ultimate hiring authority, Alice Kerns. No other candidates were suggested. A jury might conclude from this evidence that Keistler's recommendation defined and limited the pool of candidates considered by the state to fill the temporary vacancy. The state simply rubber-stamped his picks, a jury might believe. Thus, Tarpley's evidence could suggest that the state embraced Keistler's recommendations, transforming them into state action and making Keistler a state actor for purposes of § 1983.

If these were the only relevant considerations, we might be inclined to reverse the district court's grant of summary judgment. We need not reach that difficult determination, however, because there are other legal issues to consider. Tarpley claims that his First Amendment right to political association was violated by Keistler's recommending Blessing to the Department and the Governor's office. But Keistler's actions constitute an exercise of his own First Amendment right to petition the government, a fact we must take into account. We believe that what Tarpley characterizes as a conspiracy is more accurately and more commonly known as politi-

---

3. Moreover, unless the state has in fact delegated its authority in some official fashion, the private party will never have the *legal* power to, for example, hire for state jobs.

cal advocacy, another protected form of free expression. *Cf. Vickery*, 100 F.3d at 1345–46 (suggesting that party defendants might also be protected by the First Amendment's free speech clause). In this case, Keistler's actions are immunized by the First Amendment.

 The First Amendment provides that the government cannot abridge the right of the people to "petition the Government for a redress of grievances." U.S. CONST. amend. 1.[4] This right has deep common law roots and is the foundation of our republican (although not necessarily Republican) form of government. *See McDonald v. Smith*, 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L.Ed. 588 (1875); *see also Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1342 (7th Cir.1977). Thus, parties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–44, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). This so-called *Noerr–Pennington* immunity recognizes both the reach of the First Amendment right to petition and the limited ability of Congress to fetter that right. Such immunity is not absolute, however; there are situations in which the right to petition can be stretched too far. So-called "sham" petitions—"situations in which persons use the governmental process[,] as opposed to the outcome of that process," to directly harm or harass another party—are not protected by the First Amendment's right to petition. *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *see also Greater Rockford Energy & Technology*

*Corp. v. Shell Oil Co.*, 998 F.2d 391, 397 (7th Cir.1993).

Although originally applied to provide immunity from antitrust prosecution, the *Noerr–Pennington* cloak of protection has been extended to cover other areas of law, including claims under § 1983. *See Nickum v. Village of Saybrook*, 972 F.Supp. 1160, 1171 (C.D.Ill.1997) (collecting cases). For example, in *Video Int'l Prod., Inc. v. Warner–Amex Cable Communications*, 858 F.2d 1075 (5th Cir.1988), Video International Productions (VIP) sued Warner–Amex Cable (WAC) and the City of Dallas alleging that they had conspired to manipulate zoning ordinances in order to force VIP out of business. VIP had installed several satellite dishes at large apartment complexes and strung cables to connect "neighboring but separately owned apartment complexes." *Id.* at 1078. The City subsequently awarded the sole cable franchise to WAC, which immediately began agitating for the City to interpret certain zoning ordinances so as to prohibit VIP from stringing cables across property lines. Intense lobbying eventually resulted in violation notices being issued to the apartment complexes. VIP sued WAC for antitrust and § 1983 violations, as well as tortious interference with contract. The court held that the *Noerr–Pennington* doctrine shielded WAC from antitrust and tort liability. *Id.* at 1082–84. "The section 1983 claim presents more difficulty" because it "protects constitutional rights," the court stated, "so our reasoning must involve a more careful balancing of interests." *Id.* at 1084. The court continued:

> We think that if *Noerr–Pennington* is to have its intended effect at all, an analysis of whether the petitioner is a co-conspirator under section 1983 must parallel the co-conspirator exception with *Noerr–Pennington*. This conclusion is fully consistent and consonant with the language of the Supreme Court

---

4. The First Amendment's petition clause has been incorporated to apply to the states by the Fourteenth Amendment's due process clause.

*See, e.g., Hague v. Committee for Indus. Org.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

in *Dennis* . . . . Otherwise, first amendment petitioning could be challenged in the section 1983 context as a denial of equal protection, a taking of property without just compensation, a first amendment violation, or other constitutional claim, thus vitiating *Noerr–Pennington* protection. Further, we believe that the equation of section 1983 state action with the *Noerr–Pennington* co-conspirator exception sufficiently guards those constitutional rights that section 1983 serves to protect.

*Id.* at 1084.[5] Relying on similar reasoning, other courts have also applied *Noerr–Pennington* immunity to § 1983 conspiracy cases against private parties. *See, e.g., Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298–99 (6th Cir.1992); *Evers v. County of Custer*, 745 F.2d 1196, 1204 (9th Cir.1984); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614–15 (8th Cir. 1980); *see also Stern*, 547 F.2d at 1342–43 (applying *Noerr–Pennington* immunity to a civil rights conspiracy case brought under § 1985); *Nickum*, 972 F.Supp. at 1171 (concluding from its examination of precedents from the Seventh Circuit and other courts that "*Noerr–Pennington* can be utilized against claims arising under § 1983").

We find this rationale persuasive under the particular facts presented here. Government hiring on the basis of political affiliation is one thing; *Rutan* and other cases embrace the First Amendment right of political association and accordingly limit this practice. Recommending that the government hire someone (of, perhaps, the same political affiliation) is altogether different because the act of recommending implicates another First Amendment right—the right to petition. Thus, before circumscribing this practice, we must balance the competing constitutional concerns. On the one side is Tarpley's asserted right of freedom of political association; on the other is Keistler's right to petition the government for action favorable to his interests. In this case, Tarpley may not be accorded a remedy that stifles Keistler's right.

█ Most importantly, Keistler exercised a paradigmatic First Amendment right. Making suggestions about whom to hire is a traditional form of political activity. Since the Founding, politically-minded citizens have attempted to convince the government to hire people of similar political ilk. *See* Cynthia Grant Bowman, "WE DON'T WANT ANYBODY SENT:" THE DEATH OF PATRONAGE HIRING IN CHICAGO, 86 NW. U.L.REV. 57, 59–62 (1991); *see also Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803). This is, of course, what Keistler was doing. He was simply playing politics—doing what Tarpley can also do—by exercising his constitutionally-protected right to petition the government. The record suggests that Keistler's intent was exclusionary in the sense that he wanted a Republican loyalist—indeed, a Republican loyalist of his picking—to fill the temporary power plant positions at Choate. The evidence even suggests that the Edgar Administration actively sought out such recommendations. But, "[t]hat a private party's political motives are selfish is irrelevant. . . ." *City of Columbia*, 499 U.S. at 380, 111 S.Ct. 1344. Advocacy is inherently partisan, and the First Amendment guarantees freedom of such partisanship, at least in the form of political speech. Keistler was just an old-timer engaged in an old-time political activity at the core of rights protected by the First Amendment.

Further, the contours of Tarpley's asserted right to associate are circumscribed in part by the scope of Keistler's right to

---

5. In 1991, *City of Columbia*, 499 U.S. at 383–84, 111 S.Ct. 1344, eliminated the co-conspirator exception to *Noerr–Pennington* immunity, holding that the sham exception adequately covered cases in which the private party was alleged to have been in cahoots with public officials. This holding does not affect the scope of First Amendment protection—it continues to recognize limits—and so does not undermine the Fifth Circuit's compelling logic in *Video Int'l Prod.*

petition the government. *See, e.g., Mc-Donald,* 472 U.S. at 482, 105 S.Ct. 2787. Political advocacy is, after all, the reason for political association; the value in being a Democrat—as Tarpley wants to be— derives in part from the Democrats' ability to seek governmental action consistent with their ideology.[6] Again, this is all Keistler was doing, and we refuse to call his behavior tortious.

In effect, Tarpley asks us to vindicate his First Amendment rights at the expense of Keistler's. This we decline to do.[7] Section 1983 claims, as much as the antitrust laws, are not appropriate vehicles for proscribing traditional political activity such as attempts to persuade public officials. *See City of Columbia,* 499 U.S. at

380, 111 S.Ct. 1344; *Stern,* 547 F.2d at 1344. Other contexts may dictate different results, and First Amendment protections would not necessarily extend to cases where the attempt itself (rather than the intended result) created the alleged harm. In addition, where political speech is not at stake, First Amendment protection of conspiratorial speech might be very limited. We believe that these important distinctions "sufficiently guard[ ] those constitutional rights that section 1983 serves to protect." *Video Int'l Prod.,* 858 F.2d at 1084.

In this case, political speech of a well-recognized genre is at stake, and we will not allow a claim of conspiracy to undermine it.[8] "We are loathe to interpret sec-

6. Judge Ripple in dissent argues that we are protecting associational rights "less vigorously" than we should (*infra* at p. 798) and that our decision constitutes an "implicit denigration" of such rights (*infra* at p. 798). We respectfully disagree. Tarpley's right to associate is not circumscribed because his is the losing party (*see infra* at p. 798); party choice has nothing to do with it. Because the right of political association comprises (and is derivative of) the textual First Amendment rights—speech, assembly, petition and press— only by protecting the scope of the component parts (here, petition and speech) can we protect the amalgam.

It appears that the dissent would have us promote the right of political association as an end in itself, as if Tarpley were interested in being a Democrat so that he could carry a card, or perhaps wear a T-shirt, announcing his affiliation. But the right of association has *some* content. People who associate, especially those who enter the political fray, have grander, even if selfish, aspirations: they want to speak, assemble, petition or publish *in support of something. See* THE FEDERALIST No. 10 (James Madison). Political association would be an empty right indeed if partisans were not free to advocate. Thus, the right of political association is integral to republican government: "The constitutional right of association ... stemmed from the Court's recognition that effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Buckley v. Valeo,* 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (internal quotation and citation omitted). So, far from belittling the right to politi-

cal association, we think that we are promoting its vibrancy.

7. In the end, this case does demand a choice: the dissent would vindicate Tarpley's associational rights at the expense of Keistler's speech and petition rights; we do not believe, however, that it is for us to establish a hierarchy of First Amendment rights by granting one First Amendment remedy that denigrates another First Amendment right. The machinery of the courts may not be invoked to protect one First Amendment right at the expense of the other.

8. Our major disagreement with the dissent appears to be evidentiary; it asserts that we ignore Tarpley's evidence of conspiracy (*see infra* at pp. 797, 798). Again, we respectfully disagree. Tarpley's evidence of conspiracy amounts to Keistler exercising his constitutional rights at the urging of state officials. Simply because Keistler was "engaged in an old-time political activity," *see supra* at p. 795, does not require that his methods of advocacy be similarly old-fashioned We therefore see no substantial difference between the written means of communications our colleague finds acceptable, *see infra* at p. 797 ("letter writing"), and the modern means that Keistler preferred, the telephone. Perhaps if Tarpley had shown that Keistler and the state officials had specifically sought to exclude Tarpley from the state rolls, this case might be different. But, without more, the benign, if suspicious, circumstances here— Keistler recommending Blessing for a job, and Blessing being hired—are not enough. Also to this point, we cannot understand the

tion 1983 to proscribe what we thus understand to be traditional political activity." *Gorman Towers*, 626 F.2d at 615.

## III.

Tarpley tells a somewhat compelling tale of political scheming to circumvent the constitutional requirements for hiring public employees. He does have a First Amendment right not to be excluded from this public job because of his political beliefs. But the action he complains of here—another citizen's recommending an acquaintance for public employment—is protected by the First Amendment's right to petition clause. We therefore AFFIRM the district court's order granting summary judgment for the party defendants.

RIPPLE, Circuit Judge, dissenting.

Had Frank Keistler simply written to the governmental hiring authorities and advocated the hiring of someone other than Mr. Tarpley, there would be no doubt that his action would be protected under the First Amendment. *See Vickery v. Jones*, 100 F.3d 1334, 1344 (7th Cir.1996), *cert. denied*, 520 U.S. 1197, 117 S.Ct. 1553, 137 L.Ed.2d 701 (1997). Indeed, had Frank Keistler orchestrated a massive letter writing campaign among his fellow party members to pressure governmental hiring authorities to take on someone other than Mr. Tarpley, his advocacy would be protected under the First Amendment by extending the *Noerr–Pennington* doctrine [1] to § 1983 actions such as this one. *See, e.g., Eaton v. Newport Bd. of Educ.*, 975 F.2d 292 (6th Cir.1992), *cert. denied*, 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993).

As my colleagues point out, however, neither of these factual predicates can be accepted as true for the purpose of deciding whether the district court should have granted summary judgment on this record. Rather, as my colleagues also note, the record, as presently constituted, contains sufficient evidence to permit a jury to conclude that Mr. Keistler and other party officials actually conspired with representatives of the Governor's office to define and limit the pool of candidates to fill the temporary vacancy. Indeed, as my colleagues suggest, the record, as presently constituted, will support a jury determination that state officials, as part of that conspiracy, simply rubber-stamped the selections of the party officials. If a jury accepted this version of the evidence, as we must accept it now for purposes of deciding the correctness of this summary judgment ruling, the First Amendment would provide no protection for Mr. Keistler's participation in a conspiracy with state officials to deprive a citizen of his freedom of association. *See Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

My colleagues' analysis attempts to avoid this stark reality by "balancing" (*see ante* at p. 795) Mr. Keistler's First Amendment rights against those of Mr. Tarpley. That balancing is resolved, according to my colleagues, by determining that Mr. Keistler's freedom trumps that of Mr. Tarpley. This is the appropriate balance, my colleagues urge, because Mr. Keistler is exercising the "paradigmatic" First Amendment right to petition the government. (*See ante* at p. 795.)

---

dissent's embrace of *Vickery* (*see infra* at p. 797), the holding of which we believe is inconsistent with the result it seeks to achieve. *See supra* at pp. 792–93.

Nonetheless, the dissent would have a jury draw the line between constitutionally-protected advocacy and simple conspiracy. The constitutional directive is too insistent, and Tarpley's evidence insufficiently probative of a conspiracy, to allow this case to go to a

jury. As we have explained, on this record we think that the line is already clear and that Tarpley's evidence falls short.

1. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–44, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

This favoring of Mr. Keistler's rights over Mr. Tarpley's rights is premised on two considerations that cannot be supported. First, favoring the rights of Mr. Keistler is based on my colleagues' characterization of Mr. Keistler's activity as "[m]aking suggestions about whom to hire." (*See ante* at p. 795.) Several pages earlier, however, my colleagues forthrightly admit that, *as the record now comes to us*, a jury would be justified in determining that Mr. Keistler did much more than advocate that a certain person be hired; rather, he conspired with state officials to ensure that only those he recommended would constitute the viable pool of candidates. (*See ante* at p. 793.) Secondly, my colleagues' favoring of Mr. Keistler is premised on an implicit denigration of the freedom of association asserted by Mr. Tarpley and confirmed by the long line of Supreme Court decisions cited by my colleagues in the opening paragraph of the opinion. Mr. Tarpley's right to associate is "circumscribed" (*see ante* at p. 796), my colleagues assert, because he belongs to the losing party while Mr. Keistler belongs to the prevailing one. This analysis stands in stark contradiction to the holdings of the Supreme Court that conditioning public employment on political loyalty severely restricts political belief and association.

My colleagues characterize those who bring lawsuits such as this one as "well-meaning ... citizens" who are trying to "rid the state of an age-old rite." (*See ante* at p. 789.) In reality, however, Mr. Tarpley and others who seek vindication of the right to serve their state without the endorsement of the prevailing political leadership are seeking something far more important—the vindication of a right of freedom of association recognized by the highest court in the Land as part of our First Amendment freedom. My colleagues note that an individual may seek redress against a conspiracy by private citizens and state officials to deprive that individual of any other civil right. They leave unanswered a crucial question: Why should the associational right, an integral part of First Amendment protections and yet, according to my colleagues, treated with massive resistance in many quarters within our jurisdiction (*see ante* at p. 789–90), be protected any less vigorously by this court? After today's decision, this question will haunt the jurisprudence of this circuit.

Accordingly, I respectfully dissent.